Craig AMOS et al., Plaintiffs,

v.

**BOARD OF SCHOOL DIRECTORS OF the CITY OF MILWAUKEE et al., Defendants.**

**Civ. A. No. 65–C–173.**

United States District Court, E. D. Wisconsin.

Jan. 19, 1976.

Lloyd A. Barbee, Milwaukee, Wis., for plaintiffs.

L. C. Hammond, Jr., Ross R. Kinney, Ronald E. Klipsch, James P. Brennan and Carl F. Kinnel, Milwaukee, Wis., for defendants.

Curry First and Richard P. Perry, Milwaukee, Wis., and Wayne Schwartzman, Acting Gen. Counsel, Wisconsin Ed. Assoc. Council, Madison, Wis., for Wisconsin Ed. Assoc. Council, amicus curiae.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | PRELIMINARY MATTERS | 771 |
| | A. Introduction | 771 |
| | B. Appointment of Class Counsel, Class Certification, and Dismissal of Mooted Plaintiffs | 771 |
| | C. Dismissal of the Defendant Board | 776 |
| II. | FINDINGS OF FACT | 777 |
| | A. General Background | 777 |
| | 1. Introduction to the Findings of Fact | 777 |
| | 2. Definitions and Symbols | 778 |
| | 3. System Government | 779 |
| | 4. System Growth | 779 |
| | 5. Black Population Growth | 779 |
| | 6. Black Residential Patterns | 780 |
| | 7. The Neighborhood School Policy | 780 |
| | B. System Growth and Overcrowding | 781 |
| | C. Boundary Changes | 782 |
| | D. Facilities | 784 |
| | 1. School Construction, Building Additions, and Modernization | 784 |
| | 2. Playground Space | 787 |
| | 3. Substandard Classrooms | 787 |
| | E. Bussing Programs | 787 |
| | F. Student Transfer Policies | 791 |
| | G. Personnel Practices | 794 |
| | 1. Teacher Hiring | 794 |
| | 2. Substitute Teachers | 795 |
| | 3. Teacher Placement | 795 |
| | 4. Teacher Quality | 798 |
| | 5. Social Workers | 800 |
| | 6. Principals and Administrators | 800 |
| | H. The Impact of Socio-Economic Variables on Educational Achievement | 801 |
| | I. The Compensatory Educational Program | 802 |
| | 1. Special Staffing | 803 |
| | 2. Curricular Materials | 803 |
| | 3. Social Services | 804 |
| | 4. Psychological Services | 804 |
| | J. Special Programs | 804 |
| | 1. The Reading Services Program | 804 |
| | 2. The Special Class Program | 805 |
| | 3. The Superior Ability Program | 805 |
| | 4. Trade and Technical Program | 806 |
| | K. Financial Expenditures | 806 |
| | 1. Operating Expenditures | 807 |
| | 2. Construction Expenditures | 807 |
| | L. Board Attitudes and Intent | 808 |
| | M. Racial Imbalance | 810 |
| | N. Causes of Racial Imbalance | 812 |
| III. | CONCLUSIONS OF LAW | 813 |

IV. FINAL MATTERS .................................... 821
 A. Remaining Issues .................................. 821
 B. Appointment of a Special Master .................... 822
 C. Entry of Partial Judgment and Certification
 of Appeal ...................................... 824

---

## DECISION AND ORDER

### (Including Findings of Fact and Conclusions of Law)

REYNOLDS, Chief Judge.

## I. PRELIMINARY MATTERS

### A. *Introduction*

In this school desegregation case, plaintiffs seek declaratory and injunctive relief against acts of the defendants allegedly violative of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

On March 28, 1968, plaintiffs were granted leave to file an amended complaint. The amended complaint names forty-one minor plaintiffs who bring the action by their parents and next friends on behalf of themselves and two classes. Named as defendants are the Board of School Directors of the City of Milwaukee and sixteen individuals sued in their official capacities as members or servants and agents of the defendant Board. Federal jurisdiction is invoked under 28 U.S.C. § 1343, the jurisdictional counterpart of 42 U.S.C. § 1983.

The amended complaint claims that the defendants have acted to create and maintain unlawful racial segregation in the Milwaukee public school system. I have concluded that segregation exists in the Milwaukee public schools and that this segregation was intentionally created and maintained by the defendants. Such segregation is violative of the equal protection of the laws guaranteed to all Americans by the Fourteenth Amendment and cannot lawfully be allowed to continue. I shall accordingly order that the Milwaukee school system be inte-grated; that the defendants forthwith begin the formulation of plans to effectively achieve that goal; and that a master be appointed to make recommendations to the Court with respect to the question of an appropriate remedy. In addition, the Court has determined that this action may be maintained as a class action on behalf of two plaintiff classes, and has concluded that these classes should be represented in all further proceedings by appointed counsel.

### B. *Appointment of Class Counsel, Class Certification, and Dismissal of Mooted Plaintiffs*

The amended complaint alleges that thirty of the minor plaintiffs are socio-economically disadvantaged Negroes and members of a class which they seek to represent, described in the amended complaint as "Negro students attending certain public schools of the City of Milwaukee * * * who are subjected to socio-economic disadvantages, and who are denied their rights to equal educational opportunity by virtue of defendants' practices, rules, and regulations which bar the maintenance of racially integrated schools." The remaining eleven minor plaintiffs are alleged to be socio-economically favored non-Negroes and members of a class which they seek to represent, described in the amended complaint as "non-Negro students attending certain public schools of the City of Milwaukee * * * who are being denied their rights to equal educational opportunity by virtue of defendants' practices, rules, and regulations which bar the maintenance of racially integrated schools."

The amended complaint in this action was filed over seven years ago. Neither the plaintiffs nor the defendants, however, have ever made a Rule 23(c)(1) motion for a determination of whether or not the action can be maintained on behalf of the alleged classes. This oversight on the part of counsel and the Court with respect to the question of class action certification is unfortunate; at this juncture in the proceedings, however, such a determination is both necessary and appropriate. *Jeffery v. Malcolm,* 353 F.Supp. 395, 396 (S.D.N.Y. 1973).

In light of the rather substantial passage of time since the filing of the amended complaint, the Court made inquiries of counsel with respect to the issue of mootness. See generally, *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), and *Indianapolis School Commissioners v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). In response to the Court's inquiry, counsel for the plaintiffs filed three affidavits on December 2, 1975. On December 29, 1975, the Court received a letter from the defendants' counsel reciting the results of an examination of the school system's records. From the affidavits and letter, the following appears: Of the 30 black plaintiffs, 5 are presently enrolled in the Milwaukee public school system, 10 have graduated from the system, 1 has moved out of the system, and the present enrollment statuses of 14 are unknown. Of the 11 nonblack plaintiffs, 3 are presently enrolled in the Milwaukee public school system, 1 has graduated, 1 has moved out of the system, and the present enrollment statuses of 6 are unknown.

■ It is well established that class certification is appropriate in cases challenging segregation in public schools. See e. g., *Vaughns v. Board of Education of Prince George's County,* 355 F.Supp. 1034 (D.Md.1972), supplemented, 355 F.Supp. 1038 (D.Md.1972), remanded on other grounds, 468 F.2d 894 (4th Cir. 1972), on remand, 355 F.Supp. 1044 (D.Md.1972); *Potts v. Flax,* 313 F.2d 284 (5th Cir. 1963). Such suits are particularly appropriate for certification under the provisions of Rule 23(b)(2) which is available in situations where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Indeed, the Advisory Committee Notes to Rule 23(b)(2) indicate that school desegregation cases fall squarely within the intended scope of the rule: "Illustrative are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration."

■ But the Court cannot rest upon a mere finding that the subject matter of this suit is of a kind which is readily susceptible to class action treatment under Rule 23(b)(2). Before a class may be certified thereunder, the Court must first be satisfied that the prerequisites to a class action set forth in Rule 23(a) have been met. The Court will accordingly undertake a seriatim consideration of those factors.

■ The first prerequisite, set forth in Rule 23(a)(1), is that "the class is so numerous that joinder of all members is impracticable." During the 1975 school year, 114,180 students were enrolled in the Milwaukee public school system. The Court is convinced that in such circumstances, joinder is not a practical alternative to class action treatment.

The second prerequisite, set forth in Rule 23(a)(2), is that "there are questions of law or fact common to the class." In passing on the plaintiffs' claims, the Court must first determine what actions were taken by the defendants and what the effects of those actions were, and then make a finding as to the lawfulness of the defendants' practices. These factual and legal questions are clearly common to the alleged classes.

The third prerequisite, set forth in Rule 23(a)(3), is that "the claims or de-

fenses of the representative parties are typical of the claims or defenses of the class." Once again, the Court concludes that this prerequisite is easily met. With the benefit of hindsight, it is clear that the claims of the representative parties have not been atypical but, to the contrary, have been fully representative of the claims of the classes.

■ The final prerequisite to class action treatment, set forth in Rule 23(a)(4), is that "the representative parties will fairly and adequately protect the interests of the class." At the outset, it must be noted that Rule 23(a)(4)'s requirement of adequacy of representation is separate from Rule 23(a)(3)'s requirement of typicality, and both requirements must be met before an action may proceed on behalf of a class. An atypical representative party will not be allowed to prosecute a class action, regardless of the adequacy of his representation; similarly, the typicality of a named representative party does not necessarily guarantee adequate representation. Although the distinction between the two requirements is not crystal clear, Rule 23 suggests that a separate determination with respect to the question of adequacy of representation is in order.

■ Rule 23(a)(4) implicitly refers to both the representative parties and their attorneys when it speaks of adequate protection of the interests of the class. *Brandt v. Owens-Illinois, Inc.*, 62 F.R.D. 160, 165 (S.D.N.Y.1973). Thus, in considering whether a litigant will adequately represent a class, the Court must look at two criteria: whether the representative parties' attorney is qualified, experienced, and generally able to conduct the proposed litigation, and whether there is any probability that the suit is collusive or that the named parties have interests antagonistic to all or part of the class. *Williams v. Local No. 19, Sheet Metal Workers International Association*, 59 F.R.D. 49, 55 (E.D.Pa.1973). In making a determination under Rule 23(a)(4), the personal characteristics of both the representative parties and their

counsel must be examined. *In the Matter of Goldchip Funding Co.*, 61 F.R.D. 592 (M.D.Pa.1974). *Stavrides v. Mellon National Bank & Trust Co.*, 60 F.R.D. 634 (W.D.Pa.1973).

■ Putting the question of adequacy of counsel aside for the moment, the Court concludes that those plaintiffs who are presently enrolled in the Milwaukee public school system will adequately represent the two classes of pupils alleged in the amended complaint. The record contains no suggestion that this suit is collusive, nor does it appear that the interests of the presently enrolled plaintiffs are in any way antagonistic to the interests of the asserted classes.

In determining the counsel portion of the adequacy of representation requirement, the " * * * Court should weigh, among other factors, the actual qualifications and experience of the self-selected champion for the proposed class. * * * Skilled representation may be crucial, for the outcome of a class suit—whether favorable or adverse to the class—is binding on the members of the class. * * * " *Jeffery v. Malcolm*, 353 F.Supp. 395, 397 (S.D.N.Y.1973). In cases where it has been determined that the experience, qualifications, and skills of the representative party's counsel are inadequate, courts have refused to allow the action to proceed on behalf of a class. *Jeffery v. Malcolm, supra.*

Most of the reported cases considering the question of adequacy of counsel involve situations where the issue of class action certification has been raised at a relatively early point in the proceedings. The problem assumes different proportions where, as here, the question of class action certification first arises after the underlying claims have gone to a trial on the merits. In such circumstances, the Court is convinced that both the standards of legal representation and the response to a finding of the inadequacy thereof should be tailored to and reflect the posture of the proceedings.

Although at the time of the filing of the amended complaint plaintiffs were represented by no less than seven law-

yers, subsequent events, including the withdrawal of attorneys from the National Association for the Advancement of Colored People ("NAACP") on the morning of trial, have left the plaintiffs with only one attorney, Mr. Lloyd A. Barbee. Mr. Barbee is an accomplished practitioner, and the Court commends him for his dedication and perseverance throughout the long course of this protracted piece of litigation. The Court would furthermore make a finding that the services of Mr. Barbee to date have been more than adequate, and that the members of the alleged classes have been adequately represented by his diligent efforts. At the same time, however, the Court must be conscious of the fact that the finding of liability contained in today's decision marks the advent of a new stage in these proceedings. The Court will take steps to facilitate an appeal from the finding of liability should the parties so desire, but remedial efforts will proceed unabated during the course of any appellate review. In light of the possibility of an appeal and remedial efforts proceeding simultaneously, and giving due consideration to the fact that remedial efforts will proceed at an accelerated pace, the Court has concluded that the interests of the two alleged classes cannot be fully and adequately represented in future proceedings by a single practitioner, moreover a single practitioner who has, as does Mr. Barbee, the additional demanding duties of a representative in the state legislature.

As previously noted, the peculiar circumstances in which the question of class certification arises and, in particular, the overwhelming demands which will be placed on the classes' counsel in the near future, warrant the application by this Court of a heightened standard of counsel adequacy at this point in the proceedings. It should be emphasized that the result of this heightened standard's application is not intended in any way to adversely reflect on Mr. Barbee's efforts to date, but is a realistic appraisal by this Court of the expanded needs of the asserted classes in subsequent proceedings. In a similar manner, the Court is persuaded that the circumstances of this case militate against the usual consequence of a finding that the representative parties' counsel cannot adequately represent the interests of the proposed classes, i. e., a refusal to certify class action status. Mr. Barbee has adequately represented class interests to date, and the finding of liability which the Court will today enter is evidence thereof. The efforts and resources which have already gone into this case cannot be overemphasized. Giving due regard to considerations of judicial economy, the Court deems it appropriate to appoint counsel to represent the interests of the absent class members.

The Court is convinced that this step is fully consistent with the spirit of Rule 23 of the Federal Rules of Civil Procedure. Rule 23 imposes on the Court an obligation to proceed with flexibility and imagination in structuring the course of a class action. *Forbes v. Greater Minneapolis Area Board of Realtors,* 61 F.R.D. 416, 417 (D.Minn.1973). At the same time, the Court has responsibilities as the guardian of the rights of the absentee class members, and to carry out those responsibilities, is "vested [with] broad administrative, as well as adjudicative, power." *Greenfield v. Villager Industries, Inc.,* 483 F.2d 824, 832 (3rd Cir. 1973). It must be remembered that the creation of a class action is a two-step process, for "both the class determination and designation of [class] counsel * * * come through judicial determinations * * *." *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.,* 481 F.2d 1045, 1050 (2d Cir. 1973).

In certifying a class action, the Court not only confers upon absent persons the status of litigants, but in addition it creates an attorney-client relationship between those persons and a lawyer or group of lawyers. While in most instances lawyers designated as legal representatives of the class are the retained counsel of the named representative parties, there appears to be no good reason

why this should necessarily be so. The relationship between the representative parties and their lawyer or lawyers is one of private contract; the relationship between the class counsel and the members of the class, apart from the representative parties, is one of court creation. To hold that the Court is limited in its choice of class counsel to attorneys appearing for the representative parties—to assert, in effect, that the class will be represented by those attorneys or not at all—is to instill a controlling element of entrepreneurial initiative into the situation which may be contrary to the best interests of the class which the Court has a fiduciary obligation to protect. The Court concludes that it is in no way anomalous to hold that the representative parties are, as persons, adequate representatives of a class, and that those parties may continue to be represented by their privately retained counsel, and at the same time to hold that the interests of the absent class members will be best served by the appointment of separate counsel.

While unable to point to direct precedent for such a conclusion, the Court finds that indirect authority provides substantial support for this procedure. The appointment of class counsel other than the lawyer for the representative parties bringing the suit may well be necessary whenever the device of a subclass is used. *Brandt v. Owens-Illinois, Inc.,* 62 F.R.D. 160, 171 (S.D.N.Y.1974). In situations where counsel for the representative party is unable, either personally or through his firm, to provide the requisite legal services (as, for example, where simultaneous depositions are scheduled at various locations throughout the country), the Manual for Complex Litigation recognizes that the interests of the class may be best served by the employment of additional counsel. 1 Moore's Federal Practice, Part 2, § 1.44, at 40–41 (2d ed. 1975). Finally, Rule 23 itself, in subsection (d) thereof, provides that absent members of the class may intervene with counsel of their own and, more generally, constitutes recognition

of the Court's residual power to issue orders in conduct of actions to which the rule applies.

In considering the appointment of counsel to represent the classes alleged in the complaint, the Court has been particularly conscious of the tremendous demands which representation of the classes will place upon counsel. As previously noted, it is unlikely that any individual practitioner would be able to meet those demands. The Court accordingly deems it necessary to appoint as class counsel an individual who will have access to the substantial legal resources of a large law firm. With that in mind, the Court has decided to appoint Irvin B. Charne, of Milwaukee, Wisconsin, to represent the absent class members in the future course of this litigation. Mr. Charne heads a prominent Milwaukee firm of seventeen lawyers whose services will undoubtedly be necessary as the pace of this action increases.

The appointment of Mr. Charne is in no way intended to preclude the participation of the representative parties' retained counsel in subsequent proceedings. Mr. Barbee's service to date has been laudable, and his continued contributions in the future, based upon his experience and expertise in this area, will be both necessary and invaluable.

In accordance with the foregoing and pursuant to the provisions of Rule 23(c)(1), the Court will order that this action be maintained as a bipartite Rule 23(b)(2) class action. The first class shall consist of all black pupils presently enrolled and those black pupils who will in the future become enrolled in the Milwaukee public school system. This class will be represented by the five presently enrolled black plaintiffs: Kevin Armstrong, Kraig Armstrong, Mary Lou Hicks, Presten Hicks, and Jean Robinson.

A second class consisting of all nonblack pupils presently enrolled and those nonblack pupils who will in the future become enrolled in the Milwaukee public school system will also be certified. This class will be represented by the three

presently enrolled nonblack plaintiffs: Andrew Smith, Grantley H. Smith, and Kermit Smith.

The five presently enrolled black pupils and the three presently enrolled nonblack pupils will continue to be represented by Mr. Barbee. The remaining members of the certified classes will be represented by Mr. Charne. The Court is not unmindful of the fact that each of these lawyers will be representing members of two separate classes. At the present time, it does not appear that the interests of these two classes are in any way antagonistic, or that the interests of either class will be prejudiced by counsel's representation of both. See *Brandt v. Owens-Illinois, Inc.,* 62 F.R.D. 160, 171 (S.D.N.Y.1973). If in the course of future proceedings it appears that the interests of these two classes diverge, the Court will entertain a motion for the appointment of separate counsel for each class.

■■■ Since the amended complaint seeks declaratory and injunctive relief only, the claims of the thirteen plaintiffs whom the record establishes have graduated from the system or moved from the district are presently moot. Accordingly, the following plaintiffs will be dismissed from the action: Craig Amos, Jeffery Amos, Everett Keith Armstrong, Ann Marie Danforth, Carolyn Harper, Alberta Louise Hicks, Sylvia Hicks, Donna Jean O'Neal, Kim A. Robinson, Ronald K. Robinson, Cherry L. Smith, Harvard Watkins, and Vivian Watkins.

■■■ Fourteen plaintiffs remain whose present status is unknown. In the absence of an affirmative showing of a continuing case or controversy between these plaintiffs and the defendants, the Court feels constrained to dismiss them from the action. If in fact they are presently enrolled in the Milwaukee public school system, their claims may be considered to be subsumed in the claims of the certified classes.

■■■ At this time, it is appropriate to comment upon the applicability of 20 U.S.C. § 1617, which in relevant part provides:

"Upon the entry of a final order by a court of the United States against a local educational agency * * * for failure to comply with * * * the fourteenth amendment to the Constitution of the United States as [it] pertain[s] to elementary and secondary education, the court, in its discretion, upon a finding that the proceedings were necessary to bring about compliance, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

The record in this case clearly reveals that this lawsuit was necessary to rectify the unconstitutional segregation which exists in the Milwaukee public school system. It is similarly clear that today's decision establishing the liability of the defendants provides a basis for the award of attorneys' fees. " * * * [T]he entry of any order that determines substantial rights of the parties may be an appropriate occasion upon which to consider the propriety of an award of counsel fees in school desegregation cases." *Bradley v. School Board of the City of Richmond,* 416 U.S. 696, 722–723 n. 28, 94 S.Ct. 2006, 2022, 40 L.Ed.2d 476 (1974).

In accordance with 20 U.S.C. § 1617, the Court will, upon an appropriate motion and supporting affidavits, award costs to the named plaintiffs' counsel, including reasonable attorney's fees, for his efforts to date, such costs to be paid by the defendants. In addition, the Court will entertain motions from both the named plaintiffs' and the absent class members' counsel for the award of costs, including subsequently incurred reasonable attorney's fees, from time to time as the remedial efforts proceed.

### C. *Dismissal of the Defendant Board*

■■■ The Court also concludes that it is necessary to dismiss as a defendant the Board of School Directors of the City of Milwaukee. As previously noted, plaintiffs brought their suit under 42 U.S.C. § 1983 which reads as follows:

"Every person who, under color of any statute, ordinance, regulation, cus-

tom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

In *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), the Supreme Court concluded that a city was not a "person" within the scope of § 1983. Although there is no Supreme Court decision squarely in point, the Court believes that a school board is similarly not a "person" for purposes of § 1983. See, *Adkins v. Duval County School Board*, 511 F.2d 690 (5th Cir. 1975); *Burt v. Board of Trustees of Edgefield City School District*, 521 F.2d 1201 (4th Cir. 1975). As a consequence, this Court does not have subject matter jurisdiction to consider plaintiffs' claims against the defendant Board under 28 U.S.C. § 1343. *City of Kenosha v. Bruno,* supra. Nor does jurisdiction exist under the federal question provisions of 28 U.S.C. § 1331. The complaint seeks only equitable relief and does not allege any amount in controversy, much less an amount in excess of $10,000. The Court will accordingly dismiss the defendant Board for lack of subject matter jurisdiction.

 The dismissal of the Board, however, does not affect the Court's ability to proceed to a consideration of the merits of this action. Sixteen named individuals remain as parties defendant; they are clearly persons within the reach of 42 U.S.C. § 1983, and subject matter jurisdiction accordingly exists under 28 U.S.C. § 1343. Moreover, since these individual defendants were sued in their official capacities as members or agents and servants of the Board, Rule 25(d)(1) of the Federal Rules of Civil Procedure applies, the pertinent portion of which reads as follows:

"When a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party. * * * *"

Consequently, the relief which plaintiffs seek is enforceable against the present members and secretary-business manager of the Board of School Directors and the present superintendent of schools for the City of Milwaukee, and the Court will order that further proceedings in this case be conducted in their names.

Although the Board will be dismissed from this action, there are references to the "board" throughout this decision. The term is used with the understanding that it serves as a convenient expression for the official actions of the individual defendant Board members.

## II. FINDINGS OF FACT

### A. *General Background*

#### 1. *Introduction to the Findings of Fact*

This action was brought on for trial to the Court on September 10, 1973. The trial consumed thirty full days of the court's calendar before its conclusion on January 31, 1974, during which time the Court heard the testimony of approximately fifty witnesses and considered the hundreds of exhibits introduced into evidence by the parties. At the conclusion of the trial, the defendants were ordered to prepare findings of fact based upon the evidence adduced at the trial, said findings to be thereafter commented upon by the plaintiffs. The defendants filed their findings of fact with the court on October 29, 1974, and plaintiffs responded thereto in materials filed on December 13, 1974. The court also received posttrial briefs from both sides as well as an amicus curiae brief from the Wisconsin Education Association Council.

On the basis of the entire record, including all of the aforesaid, and being fully advised in the premises, the Court does herewith make the following findings of fact.

## 2. Definitions and Symbols

In order to achieve some degree of brevity in these findings of fact, it will be necessary to arbitrarily define certain terms and symbols. Unless indicated to the contrary in the text, the meanings here assigned are the meanings to be ascribed to the words and symbols herein used. Additional abbreviations or means of reference to terms may also be used in specific sections; disclosure of such reference will be by parenthetical indication following the term to which reference is made.

"*Administration*" refers to the non-elective, employed administrative personnel of the system, including school principals.

"*B*" used in conjunction with a percentage indicates that the percentage refers to the black or nonwhite portion of the whole to which reference is made. "*W*" is the converse. If the percentage appears without letter notation, it refers to the black or nonwhite racial percentage.

"*Black*" refers to persons of the negroid race, but on occasion may be utilized interchangeably with the term "nonwhite," reflecting the fact that blacks are the predominant minority racial group in the city.

"*Black Central City*" refers to that portion of the central city, generally to the north or northwest of the downtown area, which is predominantly black in residential racial composition.

"*Board*" refers to the 15 elected members of the Milwaukee Board of School Directors which is the governing body of the system.

"*Central administration*" refers to administrative personnel who serve the entire system as opposed to a particular school within the system.

"*Central City*" refers to the older central area of the city, including those residential areas on the near north side which are predominantly black and those on the near south side which are predominantly white.

"*City*" refers to the City of Milwaukee whose boundaries are coterminous with the boundaries of the system.

"*Cluster*" refers to the group of schools, including elementary schools and junior high schools, the students of which feed into a specific high school, as well as that high school.

"*Feeder school*" is a school from which students in the normal progression of their education would enter into a given named school. Both elementary and junior high schools are feeder schools to high schools.

"*Majority*" used in conjunction with the words black, white, or nonwhite means that more than 50% of the category to which reference is made is of that race.

"*1972–73,*" or any combination of two successive years during the period, refers to the school year commencing in the year first indicated and ending in the year last indicated.

"*Nonwhite*" refers to the racial group for which some system statistics are available prior to 1963–64, and generally includes all persons and students in the city or in the system other than caucasians.

"*Predominantly*" used in conjunction with the words nonwhite, black, or white means that substantially more than a majority (usually 90%) of the category to which reference is made is of the race or group used in conjunction with the word "predominantly." If the reference is followed by a parenthetical percentage disclosure, the percentage figure is the approximate overall proportion of the predominant group.

"*Racially balanced schools*" are schools which during a given time period had the same percentage of nonwhite students, teachers, and administrators as the system as a whole had during the same time period.

"*Racially imbalanced schools*" are schools that are not racially balanced.

"*School administration*" refers to the administrative personnel serving a particular school or schools.

"*Substantially racially balanced schools*" are schools whose students are not more than 70% nonwhite or black and not more than 90% white.

"*Substantially racially imbalanced schools*" refers to schools whose pupil population is 70% or more black or nonwhite, or schools that are less than 10% black or nonwhite.

"*System*" refers to the Milwaukee school system as provided for under Chapter 119, Wisconsin Statutes, and its predecessor statutes.

"*The period*" refers to the time period between 1950 and the date of trial, to which the majority of evidence and material adduced at trial pertains.

"*White*" refers to the category of persons who are not nonwhite.

"*White Central City*" refers to that portion of the central city which is predominantly white in residential racial composition.

### 3. *System Government*

The Milwaukee school system, whose boundaries are coterminous with those of the City of Milwaukee, is governed by a 15 member Board of School Directors elected at large on a nonpartisan basis to staggered six-year terms.

### 4. *System Growth*

The Milwaukee school system is one of the fifteen largest public school systems in the United States and consisted of 164 schools as of the school year 1973–74. In terms of pupil enrollment and the number of schools in the system, it has undergone a period of rapid growth in the past twenty-five years.

Between the school years 1950–51 and 1973–74, the total number of schools in the system increased by 71%. Sixty-five per cent of this growth occurred during the decade 1950–60, and 81% of this growth took place during the period 1950–65. In 1950–51, there were 79 elementary schools, 4 junior high schools, and 12 high schools (exclusive of special schools) in the system. By 1960–61, the system had grown to 115 elementary schools, 12 junior high schools, and 12 high schools. In 1973–74, there were 121 elementary schools, 19 junior high schools, and 15 high schools in the system.

In 1950, the system enrollment was approximately 67,000 pupils. By 1964, enrollments had increased by about 80% to over 120,000 pupils. During the decade 1950–60, the system and city area nearly doubled from 49 to about 92 square miles. School enrollment leveled off at 128,000 pupils in October 1972 (when the system's area was 96.5 square miles) and declined thereafter.

### 5. *Black Population Growth*

The city's black population quintupled between 1950 and 1970. In 1950, there were 21,772 black residents approximately 3½% of the city's population. During the decade 1950–60, the city's black population tripled to 62,458 (8½% of the city's population), the highest sustained rate of growth of any large city in the country. By 1970 the city had approximately 105,088 black residents (about 14½% of the population), an increase of 68% over 1960. The rise in the city's black population between 1950 and 1970, which amounted to a percentage increase in excess of 500%, was largely caused by migration from the South, particularly the central southern states of Tennessee, Arkansas, Alabama, and Mississippi. However, a relatively high birth rate among black residents was also a contributing factor.

During the period 1950 to the present, the number and percentage of black pupils in the system rose at a faster rate than the total black population. For example, the number of black (or nonwhite) pupils in the system increased from about 24,000 (19.8%) in 1964 to about 28,000 (22.2%) in 1966. Black pupils presently comprise about 35% of the system's pupil population, more than double the proportion of black residents in the city.

### 6. Black Residential Patterns

The overwhelming majority of the city's black population has tended to reside in a relatively small contiguous area in the north central and northwestern central area of the city. As of 1940, about 78% of the 8,821 black residents resided in an area bounded by West Juneau Avenue, North 12th Street, West Brown Street, and North Third Street. The remaining black population resided in contiguous areas with a very small portion residing in enclaves located elsewhere in the city.

By 1950, the residential area occupied by the majority of the city's 22,129 black residents had expanded substantially. The bulk of the black residents were concentrated in an area bounded by Juneau Avenue, Third Street, Wright Avenue, and Seventh Street.

As of 1960, 90% of the city's 62,458 black residents (about 95% of the total nonwhite population of the city) resided in an area bounded by Keefe Avenue on the north, 20th Street on the west, Juneau Avenue on the south, and Holton Street and the Milwaukee River on the east, with lesser concentrations of black residents in the fringes of this area and with a few residing in several outlying areas. In this area of heaviest nonwhite residential concentration, 62% of the residents were nonwhite.

As of 1970, almost all of the city's nearly 105,000 black citizens resided in an area generally bounded by Capitol and Congress on the north, 35th Street on the west, Holton and the Milwaukee River on the east (with the area north of Locust and east of Holton still having a relatively large white population), and Juneau on the south, continuing the pattern of expansion to the north and northwest. About 90% of the city's black population resided in this area which was 65–75% black overall, ranging from about 40% on the periphery to 75–80% and more near the center. The particular areas in the city to which black citizens have moved have been determined primarily by the areas in which residential vacancies have occurred in combination with the particular needs, desires, and incomes of the black citizens. Important factors which have determined the nature and direction of black residential expansion have been the location of some physical barriers (e. g., industrial and commercial development along the southern boundary of the north-central city), the housing characteristics of the surrounding areas, and the relative age of the white population occupying this housing. Black citizens, as had been common with other ethnic minorities, have tended to seek housing near areas already heavily populated by black citizens.

Income levels have been very important in determining where black citizens have lived. For example, the area south of Center Street is basically a low income area; the area north of Center Street to Capitol Drive is a somewhat higher income area; and the area north of Capitol Drive is a middle class area. The middle income black citizens are generally older and live in more expensive, owner-occupied, single family dwellings to the north and northwest. Black citizens with lower incomes tend to be younger and tend to move toward the west into multiple family dwelling units, with the more expensive older housing to the west serving as an economic buffer to further expansion.

### 7. The Neighborhood School Policy

The Board has consistently and uniformly adhered to a "neighborhood school policy," first developed in 1919. The essence of that policy has been the assignment of students to schools within reasonable geographic distances of the students' residences. The policy has controlled the allocation of students among the schools in the system for attendance purposes, except as to students who have voluntarily transferred from their neighborhood schools pursuant to the Board's free transfer and open transfer policies (described more fully, *infra*) and except for certain special educational programs.

In general, senior high school, junior high school, and elementary school at-

tendance zone radii have been approximately 1 mile, ¾ mile, and ½ mile, respectively, with consideration given to such factors as difficulties in site acquisition, land availability, problems in land use, availability of funds, residential development, natural or city boundaries, relative rates of pupil population growth in neighborhoods, and safety. There have been exceptions where practicalities have dictated a departure from normal distance standards.

The Board has pursued its neighborhood school policy with the conviction that it is consistent with and best promotes its policy of providing the children enrolled in the system with the best possible education limited resources will permit. The Board believes that this policy is convenient for pupils and their families, maximizes parental involvement in and support for the neighborhood school, involves the school in the community, fosters the utilization of school programs geared to the particular needs of pupils residing in the neighborhoods of the schools, and minimizes departmentalization of the student's life between school, family, and neighborhood. This central policy has been supported through the years by most Board members and has been of decisive importance in a host of decisions concerning how and where students were and will be educated, including decisions with respect to new school site selection and construction, school remodeling, school building additions, and actions taken to meet the increased crowding in the schools during the 1950's and early 1960's.

B. *System Growth and Overcrowding*

During the period stretching from 1950 through 1968–69, and to a lesser extent in recent years, there were great increases in the number of students enrolled in the system in both the developing residential areas on the periphery of the city and in the older residential areas into which black families were moving.

In 1950, the school census showed 119,-368 children (with a total enrollment of 69,131), and by 1959 the school census was 175,486. By 1964, the total enrollment in the system's schools was 120,343, an increase of about 80% over 1950, and by 1968 it was 130,736. From 1950 to 1965, the system's area doubled (47.95 to 95.78 sq. miles), and the City's population went from 637,392 to an estimated 761,-000. The 1950 census indicated that children aged 0–19 accounted for 28.8% of the city's population, while in 1960 it was 35.8%. In 1968, the estimated school census of children aged 4–19 was 210,125 (25.92% of the total population). This rise in the system's enrollment was caused by new development in some areas, by increased population density in developed areas, by a reduction in the number of children attending nonpublic schools, and by a younger population. During this period the total number of buildings went from 99 to 143, and the total school staff increased from 24,045 to 39,030. The system's total school budget rose from $18,641,190 in 1950 to $68,331,930 in 1964.

There was an uneven spread of school housing needs within the system because of variant residential concentrations. Large numbers of relatively young families locating in newly developing areas created an almost instantaneous demand for schools. In older areas, where single family homes and duplexes had been converted into multiple family dwellings occupied by younger couples with children, an added load was placed on existing school facilities.

During the late 1940's, the Administration began planning an extensive school construction program in order to meet the post-war baby boom. However, the student population boom in the residential areas that were occupied by black residents was not expected or even understood when it initially began developing.

During the 1950's and 1960's, as the percentage of blacks residing in a given residential area increased, the schools whose districts encompassed those areas became increasingly overcrowded. The school overcrowding occurred because (a) age patterns characterizing the black

population in the city were much younger than those characterizing the white population which had previously resided in the residential neighborhoods that the blacks were moving into, and (b) schools in these areas had a smaller teacher-pupil ratio and class size (about three less pupils), thereby reducing these schools student capacities. The differential age pattern was primarily the result of the fact that blacks migrating into the city were relatively young and had a higher fertility rate. There was also a use of what had been single family houses by multiple families, as there was an acute need for additional housing in the black Central City.

During the period, the school districts serving the predominantly black residential areas were overcrowded by Board-Administration standards in the sense that more pupils resided therein than the neighborhood school facilities could handle. Between 1950 and 1960, school enrollments increased 43.5%. The density of children in this area was five times that of other areas in the city. In terms of the number of elementary pupils per square mile, the peripheral area of the city went from 495 to 587 between 1950 and 1960, while the black Central City went from 1,925 to 2,764. High family mobility and substantial in-migration of families from year to year caused large enrollment fluctuations that made planning difficult. Without classroom additions, and sometimes even with them, schools in this area became overcrowded, and their district boundaries were reduced in size.

During this period the basic policies and practices concerning overcrowding were as follows: If an increase in enrollment was causing or was expected to cause overcrowding of a particular school, a determination was made as to whether the overcrowding portended to be short or long term. If deemed temporary, the first attempt was to find additional space in the overcrowded school that could be utilized for classroom purposes, such as below grade classrooms, auditoriums, and gyms. This was deemed educationally desirable, as there would be no sending of pupils outside the neighborhood school, it could be accomplished relatively quickly, and it was relatively inexpensive. The next preference would be to find nearby adjacent schools that had vacant classrooms that could handle the pupil overload by means of logical redistricting convenient to the pupils, grade reorganization (e. g., reassignment of grades 7 and/or 8) and/or bussing.

The utilization of grade reorganization fit in with the system's policy, initiated in the 1920's, of switching from a K–8 (grades kindergarten through 8) setup to K–6 elementary schools and junior high schools containing grades 7–9. By the early 1950's, the system was approximately half way through this transition. However, grade reorganization was frequently not possible because of a lack of the special facilities needed for the shop and home economics programs required for 7th and 8th grade students. Thus, primary reliance was placed on boundary changes. The least favored alternative was to transport pupils to the nearest classrooms available in other schools.

If the overcrowding was deemed long term, the first consideration would be whether an addition could be made to the existing building or whether existing but unutilized facilities could be brought into service through devices such as renting private school buildings. If additions were not practicable or desirable under the neighborhood school policy, a site for a new school would be selected in a geographic location serving a residential area having sufficient longterm student population to justify a school building. Bussing was kept to a minimum whenever practicable because of factors such as cost and parental opposition.

Among the potential alternatives not utilized was increasing the number of students in each class or utilizing half-day shifts.

## C. *Boundary Changes*

Boundary changes and grade reorganizations were primarily made to meet (a)

increasing and/or shifting student populations, or (b) changing school capacities such as those caused by completion of new buildings or additions. The boundary changes transferred pupils from an overcrowded school to adjacent schools having available space. Population shifts were flexibly responded to by the adjustment of school district boundaries so as to avoid, insofar as possible, the overcrowding or underutilization of buildings. The basic policy with regard to districting was adherence so far as practicable to the Board's neighborhood school policy after considering the area served, the pupils to be enrolled, and the available school facilities.

The procedure utilized by the Administration in determining its recommendations to the Board was as follows: After a school was identified as overcrowded, an attempt was made to provide relief via adjacent schools having available space capable of handling the needed educational program. The first step was to ascertain with respect to both the overcrowded school and the adjacent schools how many students lived in the district and in each block therein. After the number of available vacant classrooms in nearby adjacent schools was determined, the decision as to the type and nature of relief provided was made. If a boundary change was determined to be appropriate, blocks adjacent to the receiving school district containing sufficient numbers of pupils to fill the number of vacant classrooms were moved into the receiving schools' district.

Boundary changes were useful when the districts adjacent to the overcrowded school were not overcrowded. Where that situation did not exist, it would have been necessary to utilize a series of "domino" type boundary changes in order to alleviate overcrowding via boundary changes.

The Administration never recommended and the Board never made any "accordion" or "domino" type boundary changes whereby a series of boundary changes in three or more contiguous districts were made so as to relieve the overcrowding at one school by ultimately placing more pupils in the most distant school in the series. This was rejected because it was incompatible with the neighborhood school policy and would ultimately compel children to attend schools far from their homes. Such boundary changes could have led to a series of schools being located on the perimeter or even outside the district served. Another factor was parental opposition to such a policy.

With respect to boundary changes affecting all schools in the system during 1962–63 through 1966–67, as well as boundary changes affecting Central City elementary schools during 1943 through 1963, no direct relationship was established between the student body racial percentages of the receiving and/or losing schools, as these percentages varied markedly. Many of the aforesaid boundary changes were between schools with very low percentages of nonwhite pupils. Many involved changes between school districts where there was not a substantial difference in the pupil racial percentages. Where there was a substantial nonwhite percentage, there was no patterned relationship between the losing and receiving school percentages. Where substantial differences in losing and receiving school percentages existed, some involved the transfer of blacks from schools with larger percentages to schools with smaller percentages and from smaller to larger.

The absence of a direct statistical relationship with respect to the racial percentages of schools involved in boundary changes does not support a finding that boundary changes and/or grade reorganizations were devoid of impact upon racial imbalance in the system. The Board asserts that any racial effects attributable to boundary changes involving schools located in the Central City and adjoining areas were temporary in nature, the short-term impact of such changes being quickly eclipsed by the rapid expansion of black residential populations in these areas over a relatively short period of time. The fact remains,

however, that these boundary changes nevertheless affected the timing of student racial change.

In addition, the "compression" effects of boundary changes deserves mention. As black populations moved into neighborhoods previously inhabited by whites, the pupil population of the neighborhood school district would increase. This phenomenon of racial differentials in the proportion of school-age children per geographical area resulted in the overcrowding of school facilities within the pre-existing boundary lines. The Board's consistent response to this situation was the restriction or "compression" of boundary lines, often accompanied by an expansion of facility capacity through such techniques as the building of additions and the utilization of substandard classrooms. This pattern of boundary compression and facility expansion had the inevitable effect of confining and containing the disproportionately large growth in black pupil population within the borders of the newly black neighborhoods. By compressing boundaries and expanding facilities, the Board kept black pupil population from "spreading" to the rest of the city and correspondingly increased the concentration of black pupils in Central City schools and the degree of racial imbalance in the system as a whole.

This compression phenomenon is illustrated by the experience of Washington High School. During the period, Washington was fed by Peckham and Steuben Junior High Schools. Peckham in turn was predominantly fed by Clarke, Auer, and other elementary schools located west of 27th Street. There were few blacks in the cluster's schools. During the mid-1960's, white residents moved out of the area around 27th Street and black residents moved in.

During 1970, the Board redistricted the Washington High School (12.3%B, 1969–70) cluster feeder pattern, allocating a western portion populated almost exclusively by white residents (herein referred to as "the panhandle") to the Marshall High School district (2.03%B).

The cluster's grade structure was also reorganized by having all 9th graders in the district attend Washington High School rather than the junior high schools. The feeder pattern boundary change was ostensibly accomplished in order to alleviate overcrowding at Washington High School. Among the reasons given for choosing the "panhandle" area (which consisted of the 81st and 95th Street Elementary Schools) was that it was the closest area in the Washington district to Marshall High School.

Although the racial consequences of this redistricting were foreseeable by the Administration and Board members, they assert that strong educational reasons supported the actions taken. Regular school organization was cited, as the 81st and 95th Street Elementary Schools were the only elementary schools feeding into Wilbur Wright Junior High School whose students did not also go on to Marshall. Board policy has been that all elementary schools feeding into a given junior high school should, in the interests of peer relationship and educational program continuity, feed into the same high school. The Board also noted a "long standing" community belief that 95th Street Elementary School would feed into Marshall when the latter was built.

In the fall of 1970, following redistricting, there were approximately 2,000 white and 500 black pupils at Washington High School (20%B). By the fall of 1972, white enrollment had dropped to 1,400, and black enrollment was up to about 950 (38%B).

D. *Facilities*

1. *School Construction, Building Additions, and Modernization*

Historically, the neighborhood school policy, together with the pattern and timing of residential development in various areas of the system, has been determinative of when and where new schools were constructed; i. e., school building construction has been tied to the historical pattern of residential growth within the system. Hence, the older school buildings in the system are in the older

Central City area. Conversely, most new schools have been located in the developing residential areas on the outer periphery of the city. In these areas, whose annexation in the years between 1950 and 1969 nearly doubled the city's area, the neighborhood school policy dictated that new schools be created so that children in these areas could attend schools of appropriate sizes and within reasonable walking distances.

While the newly annexed areas of the city were receiving new schools and new school districts to handle their rising student populations, the Central City was faced with problems which, although similar, were presented in a different context. There, school facilities within reasonable walking distances of the students' residences existed in each school district. The problem of providing adequate space and structures to handle the rapidly increasing pupil population density in the districts arose in the context of higher land and construction costs and reduced site availability. Inadequate older structures which could not be economically and satisfactorily remodeled were replaced if the need for a school was projected to continue, or were abandoned if no longer needed. Schools which were structurally sound and could be economically remodeled were modernized.

The primary goal of the remodeling/modernization program, approved early in 1958 by the Board, was to bring structurally sound older schools which were still needed in their neighborhoods up to standards deemed presently current and appropriate in terms of changing program needs and changing lighting, acoustic, and furniture standards. Modernization costs were considerably less than costs for new construction but provided efficient and economical building use for a comparable number of years. Further, time was an important factor, and modernization could be accomplished more quickly than new construction.

Building additions, rather than replacement schools or additional new schools, were constructed in accordance with existing and projected long term and temporary space and student needs, considering such factors as the amount of playground space which would be consumed by an addition at the existing school site, the resulting size of the school after the addition, the kinds of programs which could be offered at the school, and the educational effects upon the students. The construction of an addition sometimes involved a concomitant temporary boundary change to handle overcrowding, and additions often contained a little extra capacity to meet expected needs with respect to surrounding districts.

The construction program engaged in during this period was financed pursuant to school bond issues and the construction fund tax levy, with the bulk of the funds coming from the former source.

During 1950–64, 135 major construction projects costing $90 million were completed in the system, including 44 new schools (34 elementary, 7 junior high, and 3 senior high), 67 additions to or alterations of existing structures, and 20 building modernizations. The 1966–70 five-year program included construction of 17 new schools, replacement of 5 schools, 13 additions, and 20 modernizations. The total cost was $45,745,000.

During this period, the Administration and its department of school housing resources gathered pertinent population and student data in order to plan for the long-term student housing needs of the system's pupils. The Administration's planning personnel during this period utilized, among other information, data contained in United States census reports, information concerning real estate development, student enrollment data, and data concerning urban renewal programs, the planning and development of parks, playgrounds, expressways, and off street parking lots. Among the census data considered was that relating to the age distribution of persons residing in certain census tracts. This data was utilized to predict future numbers of school-age children in the residential are-

as served by the system's schools, but was not used with respect to boundary changes. The data indicated that black residents tended to have a disproportionately large number of preschool and school-age children, and that relatively more black residents were of child rearing age. Recognition of these markedly different census data patterns of black and white residents enabled the Administration to understand one of the primary causes of the increased enrollment in those schools serving black residential areas, and to predict which schools would experience rapid growth in the future.

The basic Board-Administration policies and practices during this period have resulted in a disproportionately large number of elementary and secondary schools whose student bodies are predominantly nonwhite having older initial buildings; i. e., the first building that was constructed which is presently used by that school. The initial buildings in the elementary schools which were 90% or more nonwhite in 1968 averaged 71.8 years of age, while the initial buildings of elementary schools which were 90% or more white averaged only 33 years of age. As of 1968, the average age of the initial buildings of schools which had classroom additions after 1950–51 ranged from 75 to 84 years for the schools which were 10–33%, 33–50%, 50–67%, 67–90%, or 90–100% black, but the average age for the initial buildings of such schools which were 90% or more white was only 23 years. As of 1968, three-fifths of the majority white secondary schools' initial buildings were less than 40 years old, while only one-third of the majority black secondary schools' initial buildings were less than 40 years old. Further, 42 out of the 86 elementary schools which were 90% or more white in 1968 had buildings constructed after 1950, whereas 15 of the 16 elementary schools which were 90% or more nonwhite in 1968 had initial buildings constructed before 1950. The evidence does not establish what the situation has been during the period from 1968 to the present.

The range of ages of the various school buildings utilized throughout the city varies substantially—from buildings constructed in 1864 to the ones presently under construction. The bulk of the new construction occurred in the 1950's to meet rapidly increasing numbers of students in the system. Of the 17 secondary schools built before 1950, 12 were more than 67% white as of 1968, and 10 were more than 90% white. Of the 14 secondary schools built after 1950, 11 were 90% or more white, 1 was 67–90% white, 1 was 33–50% black, and 1 was 90–100% black as of 1968. Hence, although many of the oldest secondary schools in the system are predominantly white, most of the more recently constructed secondary schools are predominantly white, and the predominantly black schools are older on the average.

As of 1968, of the 27 elementary schools in which initial buildings were built before 1900, 11 were 90–100% black, 3 were 67–90% black, 1 was 50–67% black, 1 was 10–33% black, and 11 were 0–10% black. Of the elementary schools in which initial buildings were built before 1950, 44 were 0–10% black, 3 were 10–33% black, 1 was 33–50% black, 2 were 50–67% black, 7 were 67–90% black, and 15 were 90–100% black. Of the 48 elementary schools in which initial buildings were constructed after 1950, 42 were 0–10% black. As a result, in 1968 the average age of the initial buildings in the predominantly white elementary schools was much less than the average age of the initial buildings in the predominantly black elementary schools.

This relative disparity in the average ages of the initial buildings in the schools with predominantly black and predominantly white student bodies exists because most of the more recently constructed initial buildings are in schools serving and located in residential areas that are predominantly white. Most new schools have been created on the outer periphery of the city during the last 15 years because the need for entirely new schools (as opposed to additions) has been greatest in these areas where the largest quantum of new residential construction has taken place. In

contrast, population growth created an initial need for schools much earlier in the older central areas of the city; as a result, the schools in this area were built first, and are consequently older than those buildings constructed on the periphery at a later date to meet a later need.

## 2. *Playground Space*

Plaintiffs proved that playground space measured upon a 1967–68 per assigned pupil basis was generally substantially less in the predominantly black elementary schools than in the predominantly white elementary schools. The evidence does not establish in detail what the playground space situation has been during 1967–68 to the present, or what it was in secondary schools at any time. The evidence does not establish what the schools' racial percentages were at the time that their construction plans (including planned playground space) were adopted by the Administration and the Board.

The aforesaid disproportionality existed because (a) most blacks resided in the older portions of the city and attended predominantly black neighborhood schools which had greatly increased student enrollments, (b) the predominantly black schools have older sites located in the more residentially and commercially developed portions of the city where land has not been available during this period, and (c) playgrounds for these older sites were initially designed pursuant to standards calling for less playground space than standards presently prevalent or prevalent at a time before any additions had been built to handle increased enrollments. In contrast, the newer schools in the peripheral and predominantly white areas have playgrounds planned under the more generous current standards and make allowance for potential future population growth.

## 3. *Substandard Classrooms*

"Substandard classrooms" were defined as classrooms which for any reason failed to meet state and city building code requirements, disregarding govern-ment granted variances approving use of such rooms for classroom purposes. Plaintiffs proved that during 1953–54 through 1965–66, the number of substandard rooms being used in the elementary schools which were 33% or more nonwhite was greater, to a "statistically significant" degree, than the number of substandard rooms being used in elementary schools which were less than 33% nonwhite. The evidence does not establish that any such differences were "statistically significant" prior to or after this period or what the situation was at any time with respect to secondary schools. Nor does the evidence establish that during the aforesaid period there were any disproportionalities in the number of substandard classrooms utilized in predominantly nonwhite schools (90–100%) as compared to predominantly white (0–10%) schools.

Most of the substandard classrooms were in older schools and most were basement rooms; i. e., those which failed to satisfy the building code requirements existing during a portion of this period merely because they were more than 2½ feet below ground. Generally, these rooms averaged 715 to 1,200 square feet, had fluorescent lighting, satisfied building code fresh air requirements, and were little different from other classrooms in the same building.

Substandard classrooms were utilized in various schools during earlier portions of this period because the rapid increase in student enrollment created serious needs for space to house students, and because the Board and Administration wished to avoid half day shifts, higher student-teacher ratios, and increased bussing. The aforesaid disproportionality reflects the fact that during the late 1950's and the 1960's, much of the rapid pupil increase occurred in the older Central City school buildings which had basements, and that most of the schools having substantial percentages of black students were in these buildings.

Since the end of rapid increases in pupil population, few substandard classrooms have been used in any schools in

the system. At present, there are only about a dozen classroom variances in process or outstanding. For the most part these variances concern the installation of approved delayed fire alarm systems and the limited use of transportable classrooms at Auer Avenue school and elsewhere because of isolated overcrowding.

 The evidence establishes that Board or Administration acts or omissions concerning the creation of new schools, the modernization of existing schools, the construction of additions to existing schools, and the reopening or leasing of schools contributed substantially to the present student body racial percentages in the predominantly black schools. Schools presently having student bodies 70% or more nonwhite are the result of the interaction of the neighborhood school policy and present racial residential patterns.

The Board and the Administration, in adhering to and carrying out the neighborhood school policy, acted with the knowledge that the total effect of their actions in furtherance of that policy would be the segregation of black and white students in separate schools. Board and Administration determinations concerning site selection, building additions, school size, and district boundaries, among others, were made with the knowledge of their racial effect because there was general knowledge as to the racial characteristics of neighborhoods affected by such decisions. The evidence established that with respect to any such decision, alternatives were available which would have resulted in schools which are presently predominantly black having substantially lower proportions of their students nonwhite. However, these alternatives were not consistent with the neighborhood school policy and, consequently, were not adopted.

E. *Bussing Programs*

During the 1950's and early 1960's, the peripheral areas of the city had school districts encompassing large areas, and it was necessary to bus students to school because of the great distances between their residences and the school. As population density in these areas increased, additional schools were built with the concomitant result that students traveled shorter distances to get to schools, and in many instances bussing ceased to be necessary. In the central portion of the city where population density was always high during this period, the school districts were relatively small, and students could generally walk between their residences and schools. Bussing was seldom necessary until the modernization program was embarked upon and overcrowding began to develop in the 1960's.

The basic policies and practices were that bussing would take place because of excessive distance (student residence more than two miles from school), unusual hazard (e. g., no sidewalk or shoulder along roadway), to attend exceptional educational programs (interrelated language skill center), to alleviate conditions of overcrowding, the lack of a school facility within the district, to accomplish modernization, and for participation in athletic events and intramural sports activity. The Board claims that it never was Board policy to bus students in order to promote "racial goals" or to consider race in making determinations.

The system's total transportation expenditures are over two million dollars per year. During 1972–73, the gross cost of transporting regular pupils was $736,-970 for both public and private students ($575,986 for public students). Total state aid amounted to $105,774 ($21,852 for private students). Transportation expenditures with respect to public exceptional education was $1,050,444 with 70% thereof being covered by state aids. Transportation expenditures with respect to private exceptional education was $269,269 with state aid amounting to $69,306. There was no federal reimbursement for any transportation costs.

During 1973–74, the Administration contracted for 291 vehicles which traveled 326 daily routes transporting about 11,000 pupils to and from 128 public schools and 45 nonpublic schools, traveling a distance of about 1,864,300 miles.

Bussing for overcrowding and modernization purposes occurred primarily in the Central City schools because of the Board and Administration commitments to the modernization program for older schools and reduction of class sizes, a reluctance to use educationally inferior rooms and special facilities for classroom purposes, and a commitment to full-day educational programs rather than shifts. Board policies and Administration practices with respect to overcrowding were (a) to utilize facilities within the neighborhood district whenever practicable because of the neighborhood school policy and cost considerations, (b) to use bussing only as a nonpermanent measure whenever practicable to alleviate temporary overcrowding, and (c) change class groups, students, and teachers every semester or year so as not to put the bussing burden on the same persons for extended periods of time.

From 1950 to the present, two different procedures have been utilized with respect to the relationship of bussed students to the receiving school. Prior to 1971, the basic Board policy and practice was to bus students via the "intact" class method if the particular students involved would not be bussed to the receiving school for more than one year. The "mixed" student method was utilized if the particular students were to be bussed for more than one year and assigned to the receiving school upon a permanent or indefinite basis.

Under the "intact" method, entire classes assigned to the neighborhood district school would be bussed with their teachers to another school or schools and kept "intact" therein as classes. Although children in these classes might mix with other students at the receiving school during recess periods, lunch programs, and school assemblies, they were not otherwise integrated into the structure of the receiving school. Under the "mixed" method, students from a neighborhood district would be assigned to the receiving school (i. e., transferred thereto) and be considered as part of that school's student body in the formulation of the receiving school's classes; i. e., the transferred students would be "mixed" with the receiving school's students in the various classes at that school.

The Board considered intact bussing to have certain advantages. It could be accomplished flexibly during irregular time periods not amounting to one full semester or one full year. It was economical because bussing expenditures would be made only for the actual period that bussing was necessary. It was efficient because the records in Administrative control could be maintained at the neighborhood school with no need to reshuffle records at the receiving school, making them less accessible to parents of the bussed students. It was deemed to have educational advantages because it avoided the necessity of reorganizing classes in the middle of a semester's program, thereby obviating the destruction of the continuity of a semester's educational program which the changing of teachers would involve. By staying with their neighborhood school teacher and utilizing the neighborhood schools instructional materials and equipment at the receiving school, pupils remained in constant and direct contact with a teacher familiar with and experienced in meeting their individual educational abilities and needs.

When bussing was provided because there was no school in the district in which the children resided, the bussing was always "integrated" or "mixed" because the students were assigned permanently to the school to which they were bussed. Bussing for this reason occurred only in schools of the 0–10%B category, there being no districts in the Central City which did not have schools located therein. Bussing provided because a district school lacked sufficient classroom space was always intact because the students were only being bussed upon a temporary basis (not over one year) and were not permanently assigned to the receiving school. Bussing for this reason occurred primarily from schools in the 0–10%, 67–90%, and 90–100% categories. When bussing was provided because of remodeling or "modernization," it was always intact because the students were

only bussed upon a temporary basis (not over one semester) and were not permanently assigned to the receiving school. It occurred from schools in all categories. When bussing was provided because of difficulty of access to facilities (primarily because of the excessive walking distance), it was always integrated or mixed because it was on a continuing and area basis, and the students were permanently assigned to the school to which they were bussed. Bussing for this purpose did not occur with respect to schools located in the black Central City schools because students generally resided within easy walking distances of their district schools. When bussing was provided pursuant to petitions from parents (primarily for safety reasons), it was always integrated because of its indefinite duration and the permanent assignment of such students to the receiving school.

Because of the aforesaid policies, practices, and factual circumstances, bussing from the black Central City schools was disproportionately on an intact basis as opposed to integrated or mixed during 1950–1969. A disproportionate percentage of the integrated bussing involved students assigned to schools in the 0–10%B and 10–33%B categories because the purposes for which this type of bussing was utilized occurred most often with respect to such schools (e. g., no school in district, excessive walking distances to the schools, walking safety hazards). Such needs did not occur with respect to schools located in the central area because these districts had schools within reasonable walking distances for the students.

During this period, the bussing of particular students because of overcrowding or modernization generally lasted for less than one year. The basic policy was always to bus and to contract for bussing only for the period necessary. The policy was adopted in part because of cost considerations and the educational benefits deemed to flow from the neighborhood school policy. Modernization never rendered classrooms unavailable for more than one semester and generally ended in the middle of the semester. Transporting for overcrowding purposes occasionally was started and shortly thereafter terminated when it became apparent that student enrollment projections had been inaccurate. Similarly, bussing for purposes of relieving overcrowding would be terminated in the middle of a semester if the building of a classroom addition was then completed. Designation of receiving schools was on a temporary-type basis and could and did vary between semesters because of changes in classroom availability.

Generally, with certain exceptions, bussing for overcrowding from a school lasted only for a few semesters. Among the exceptions were the following elementary schools which tended to be predominantly black.

| Elementary School | Time Period | No. of Pupils Involved | Percentage Range of Black Students |
|---|---|---|---|
| Auer | 1966–67 to 1969–70 | 60–600 | 56.53–89.27% |
| Berger | 1965–66 to 1972–73 | 30–540 | 77.87–97.7% |
| Brown | 1962–63 to 1966–67 | 105–206 | 67.00–93.91% |
| Clarke | 1966–67 to 1971–72 | 64–300 | 39.81–79.94% |
| Elm | 1963–64 to 1967–68 | 61–360 | 9.3 –55.46% |
| Emerson | 1963–64 to 1968–69 | 35–140 | 0.96– 2.37% |
| Engleburg | 1958–59 to 1959–60 and 1966–67 to 1968–69 | 20–106 | 0.00– 0.93% |
| Franklin | 1968–69 to 1972–73 | 60–150 | 90.86–98.17% |
| Green Bay | 1966–67 to 1972–73 | 30–150 | 67.87–98.27% |
| Keefe | 1963–64 to 1971–72 | 32–288 | 94.12–99.52% |
| Lloyd | 1963–64 to 1966–67 | 30–66 | 99.16–98.68% |
| Siefert | 1963–64 to 1965–66 | 30–99 | 94.09–97.08% |
| Twentieth | 1960–61 to 1965–66 | 40–210 | 70.5 –97.7% |
| Twenty-first | 1964–65 to 1969–70 | 33–150 | 82.1 –97.85% |
| Walnut | 1963–64 to 1966–67 | 26–30 | 50.72–71.54% |
| Whitman | 1962–63 to 1968–69 | 34–114 | 0.00–12% |

Pupils bussed for purposes of overcrowding or modernization were returned to their neighborhood school during the lunch hour, even at times when lunch facilities were available at the receiving school.

In August 1971, the basic policy concerning intact bussing was amended by the Board to provide that if the bussing of particular students was not planned to last one year or more, it would be the "intact" method; if planned for one year or more, the mixed method of bussing was to be used.

From 1958–59 through 1962–63, a total of 8,241 pupils were bussed intact from black Central City schools in 23 instances of bussing lasting a semester or less; 1,002 were bussed for overcrowding during 11 of the instances, averaging 91.09 pupils from each school per semester, and 7,239 were bussed for modernization in 12 instances, averaging 603.25 pupils from each school per semester.

In the peripheral area schools, there were a total of 7,882 pupils bussed intact during this same period in 24 instances of semester (or less) bussing; 1,690 pupils were bussed for overcrowding during 12 instances, averaging 140.83 pupils per school per semester, and 6,192 were bussed for modernization in 12 instances, averaging 516 pupils per instance.

From 1963–64 through 1967–68, a total of 12,482 pupils were bussed intact from black Central City schools in 74 instances of semester (or less) bussing; 7,905 pupils were bussed for overcrowding during 67 instances, averaging 117.98 pupils per instance; and 4,577 pupils were bussed for modernization during 7 instances, averaging 653.8 pupils per instance.

In peripheral area schools, there were a total of 7,709 pupils being bussed intact during this same period in 44 instances of semester (or less) bussing; 3,735 pupils were bussed for overcrowding involving 36 instances, averaging 103.75 pupils per instance; and 3,974 pupils were bussed for modernization in 8 instances, averaging 496.7 pupils per instance.

From 1968–69 through the time of trial, there was no bussing for modernization in the black Central City schools and only 1 instance of such bussing (640 pupils) in the peripheral area. In the system as a whole, a total of 8,405 students were bussed for overcrowding during the same period; most of this bussing was from schools with high black racial percentages. During 1970–71 to 1972–73, there were about 900–1,364 students (about 1% of the system's total enrollment) being bussed for overcrowding each year to about 15 receiving schools. In 1973–74, it dropped to 600, the lowest since 1964–65. Bussing for overcrowding during 1972 to the present has been mixed rather than intact.

During 1958–59 through 1973–74, there were a total of 509 instances of bussing from one school to another because of overcrowding or modernization. Of these 509 instances, 214 (42%) involved movements between schools of about the same student body racial compositions, 51 between basically black student bodies, and 163 between basically white student bodies. There were 289 instances (56.7%) which involved movements from schools whose racial percentages were substantially different: 9 involved movements to schools with substantially greater black percentages, and 280 involved movements to schools with substantially lesser black percentages. Six (1.3%) of the instances of bussing involved transportation to special schools.

## F. Student Transfer Policies

Historically, the Board has had two transfer policies under which students could voluntarily transfer from their neighborhood schools to the other schools in the System. These were the "free transfer policy" ("Free Transfer") which was adopted as early as 1947 and continued until 1964, and the "open transfer policy" ("Open Transfer") which was adopted in 1964 in response to requests by the NAACP and other civil rights groups. The only substantial difference between the "free" and "open" procedure was that under the latter, unlike the former, applications need not state a

reason, and generally no member of the Administration makes a judgment as to whether the requested transfer would be in the best interest of the student.

Under the Free Transfer procedure (1) the reason therefor was stated on the application, (2) thereafter the principals of the losing and receiving schools would be contacted and the reasons would be discussed, and (3) if both approved, available space existed in the receiving school, and there were no reasons why the transfer should not be made, the central office would automatically issue the transfer permit. If either or both of the principals were opposed to the transfer, then the final decision was made by the assistant superintendent and/or his designee in the Central Administration. This decision was made after extensive review of the student's situation, including conferences with the parents and/or pupil in which the pertinent reasons would be discussed in depth. The controlling consideration was whether there were any reasons why the requested transfer should not be granted in terms of the best interests of the student in light of such factors as program adequacy, the distance involved in going from home to school, validity of the stated reasons, and the availability of space in desired classes. These determinations were not based upon the race of the student and/or the student body racial composition of the losing and/or receiving schools, as race, religion, or national origin were not considered to be valid reasons for requesting a transfer.

Under the Open Transfer procedure (1) the transfer application would generally be automatically approved by the Central Office if there was available space at the receiving school, (2) all denials were the result of the lack of available room, and (3) first priority was given to pupils residing in the district who wished to attend their neighborhood school.

Under both procedures (1) a transfer once issued to a student was permanent in the sense that it need not be renewed each year, and (2) transportation was not provided by the system. Board policy and Administration practice has been to follow a first-come, first-served basis with priority determined by the time stamped on the transfer application when it was filed with the Central Office.

The procedures under both the Free and Open Transfers were that prior to May 1 and December 1 of each year (i. e., near the end of the school year and prior to the beginning of the second semester, respectively), the principals of the schools in the system would indicate their projected enrollments for the coming semester. If there was available room in a particular class after school commenced, transfer applications would thereafter be granted to fill the spots available therein.

During the early 1960's, a number of civil rights groups in the community suggested that the opportunities for students to transfer from one school might be enhanced by eliminating the requirement of having a reason therefor. In 1964, Board member Golightly (who is black) and the NAACP made such a proposal. It was argued that affording students an opportunity to choose to attend schools located outside their residential neighborhoods would lead to racial integration in the system's schools. The Board adopted the Open Transfer proposal upon the recommendation of the Committee on Equal Educational Opportunity, then chaired by member Story.

During the early 1960's, open enrollment plans were considered by some to be a means of accomplishing desegregation. Time proved them wrong. While Open Transfer policies have been denominated methods of desegregating schools, experience with human behavior in this country indicates they are not very successful in accomplishing this result. This procedure has not been utilized by sufficient black students transferring to predominantly white schools to eliminate predominantly black schools or otherwise achieve anything akin to racial balance in the system's schools, and it proved to

be an open invitation to white students to flee from black schools.

The incidence of transfers among secondary students is suggested by the following figures: During 1967–68, there were 4,032 applications, of which 3,300 (81.9%) were granted; during 1968–69, there were 4,570 applications, of which 3,727 (81.6%) were granted; during 1971–72, there were 3,861 applications, of which 2,814 (72.9%) were granted; during 1972–73, there were 4,327 applications, of which 3,522 (81.4%) were granted. During this period of time the system's total secondary school enrollment was approximately 45,770. Thus, during each year the number of transfers granted averaged 7.39% of total secondary enrollment. This statistic, however, does not truthfully represent the total impact on the secondary system because of the fact that the transfers granted were permanent in nature; i. e., once granted, they did not have to be reviewed or otherwise renewed in following years. The cumulative transfer effect was thus greater than the foregoing statistics might suggest.

During the period 1950–68, for example, the evidence established that voluntary transfers were a factor substantially affecting the percentage of nonwhite students at the following schools during the following years:

(a) During 1961–62 through 1967–68, King High School's enrollment was about 2,028, and its student body racial percentage went from about 10–33%B to 76.54%B. There were generally in excess of 100 white students and approximately 25 to 50 black students transferring out each year. During 1961–62 through 1963–64, there were about 50 black and 140 white students transferring in per year. During 1964–65, there were 64 black and 54 white incoming students; from 1965–66 through 1967–68, the number of students transferring in was insubstantial.

(b) During 1961–62 through 1967–68, North High School had an enrollment of about 1,450, and its student body racial percentage was in the 90–100% category.

Each year it had substantial numbers of both black and white students transferring out, ranging from about 300 students per year (about 150 white and 150 black) to about 175 students (145 black and 30 white) near the end of this period. During the earlier portion of this period, there were substantial numbers of black students transferring in but never substantial numbers of white students. Near the end of this period, the number of students transferring in became insubstantial.

(c) During 1961–62 through 1967–68, Fulton Junior High School had an enrollment of about 1,221, and its student body racial percentage was always in the 90–100% category. During this period the total number of students transferring out ranged from 100 to 140 pupils per year, with the number of white students ranging from about 50 to 100 per year, and the number of black students ranging from about 50 to 65 per year. During this period the number of students transferring into Fulton Junior High School was never substantial.

(d) During 1961–62 through 1967–68, Roosevelt Junior High School had a total student enrollment of about 931, and its student body racial percentage was always in the 90–100% category. Each year there were about 150 to 175 black students transferring out and about 15 to 30 white students transferring out. During this period the number of students transferring in was never substantial.

(e) During 1961–62 through 1967–68, Wells Junior High School had student enrollments of about 1,136, with its racial percentage going from about 33–50%B to 57.47%B. During the first three years of this period, there were an insubstantial number of black students transferring out and about 175 white students transferring out each year. During the last four years of this period, there were about 35 black students transferring out and in excess of 200 white students transferring out each year. During the first three years of this period, there were generally in excess of 80 black stu-

dents and 50 white students transferring in each year. During the last four years, there were generally around 90 black students and about 25 white students transferring in each year.

(f) During 1957–58 through 1967–68, Berger Elementary School had student enrollments of about 686, with its student body racial percentage going from 1–10%B to 88.24%B. From 1962–63 on, there were generally about 20 black and 30 to 40 white students transferring out each year. During the first few years of this period, there were about 20 to 25 white students transferring in each year. Other than this, the number of transfers in were insubstantial.

(g) During 1957–58 through 1967–68, 4th Street Elementary School's student body was about 465, with its student body racial percentage being in the 90–100% category. During 1957–58 through 1967–68, there were an insubstantial number of students transferring out each year. During the same period, a substantial number of black students transferred in each year. The number of white students transferring in was insubstantial.

(h) During 1957–58 through 1967–68, Keefe Elementary School had student enrollments of about 950, with its student body racial category going from 10–33%B in 1957–58 to 98.59%B in 1967–68. Prior to 1961–62, when the school was in the 67–90% category, the number of black students transferring out was insubstantial. At that time, however, there were in excess of 30 white students transferring out each year. During the last six years of this period, there were in excess of 20 black and 10 white students transferring out each year. With respect to incoming transfers, after 1962 there were not substantial numbers of students involved. During 1957–58 through 1959–60, there were generally about 25 to 30 white students transferring in each year. During the next two years, there were generally around 15 black and 20 white students transferring in each year.

## G. *Personnel Practices*

### 1. *Teacher Hiring*

During the early and mid-1960's, teachers were in short supply in this country. The system had an intensive recruitment program throughout the United States, but competition from other school systems in the United States was keen. Rapidly expanding student populations in the system during these years increased the demand for additional teachers. The shortage was greatly alleviated around 1969 and 1970.

Since at least the early 1960's, the Administration's policy and practice has been to put heavy emphasis upon increasing the number and percentage of minority employees, particularly teachers, principals, and administrators. Relatively small numbers of black teachers graduate from Wisconsin schools of education, so geographically expansive recruitment was necessary. The intensification of the recruitment program included sending recruiters to the southern and eastern portions of the United States where there were colleges and universities whose students were predominantly black. The number of blacks on the system's recruiting staff was increased from 1 to 11 or 12. Particular emphasis was placed upon increasing the scope of recruiting advertising so as to utilize advertising media which reaches minority groups.

During the early 1960's, the minority recruiting program was only moderately successful. A number of black teachers were hired but not as many as the Administration would have liked. For example, during 1967–68, there were 120 elementary schools in the system and 380 nonwhite elementary teachers. Hence, if they had been equally divided among the schools, there would only have been slightly more than 3 nonwhite teachers per school.

There has not been utilization of different standards with respect to black teachers but rather a commitment to ensuring that every consideration is given black teachers. There has been a high

level of competition in the country for qualified black teachers. It has been particularly hard for the system, since most of the recruiting had to be accomplished out of state against local competition there. Local recruiters (e. g., Oklahoma, Tennessee, and Ohio) were often more successful to the extent that black teachers preferred to remain relatively near their homes.

The intensification of the minority recruitment program has resulted in significant progress, although Administration goals (which do not include any quotas) have not yet been reached. Presently upwards of 15% of the system's teachers (about 800 of 5,700–5,800) are black, upwards of 15% of the principals and administrators are black, and a substantial percentage of the school aides are black. This has been due in part to the increasing number of black graduates qualified in education during recent years as well as the increasing number of blacks who hold advanced education degrees.

In the fall of 1969, 682 new teachers were employed, and of these 60 were black (8.5%). For the second semester 1969–70, 27 of the 142 new teachers (19%) were black. For 1971–72, 333 black teachers were interviewed and/or submitted applications, and of these 69 were employed. For 1972–73, the system hired 494 new teachers, 80 of which were black (16.2%).

## 2. *Substitute Teachers*

Substitute teachers are teachers who take over a class when a regular teacher is absent for any reason. The evidence does not establish that the substitute teachers utilized during the period were ever of inferior ability and/or quality as compared to regular teachers.

During recent years, one goal of the Administration has been to eliminate the system's use of long-term substitute teachers. The aforesaid goal was largely attained by 1970 when there was an ample supply of teachers in this country. The substitutes on long-term duty in the spring went from 50 in 1969 to 3⅓ in

1970 to 11 in 1971. The substitutes on long-term duty in the fall of 1969, 1970, and 1971, respectively, went from 82 to 9 to 12. As a result of the abundance of teachers, over two-thirds of the present substitute staff consists of fully certified teachers.

During 1967–68, those elementary and secondary schools whose student bodies were 50%B utilized relatively more substitute teacher days (40% of the system's total) as a proportion of the total teacher days utilized (25%). Those elementary schools whose student bodies were 33–67%B or 67–90%B utilized relatively more substitute teacher days than did those elementary schools whose student bodies were 90–100%B. The elementary and secondary schools whose student bodies were 90–100%B utilized approximately 14% of the total teacher days and 22% of the total substitute teacher days, whereas the schools whose student bodies were 0–10%B utilized 66% of the system's teacher days and 50% of the substitute teacher days. The evidence does not establish that the aforesaid pattern was anything but a reflection of the pattern of regular teacher absences among the system's schools during those years.

The evidence does not establish what the situation was in the aforesaid respects either before or after 1967–68.

## 3. *Teacher Placement*

During this period the basic Board policy and Administration practice with respect to placement of teachers within the system's schools has been (a) to make certain priority assignments (i. e., excess teachers from schools whose student enrollment fell, teachers returning from illness leave, and teachers involved in an administrative move such as on principal recommendation due to difficulty in prior assignment); (b) to next fill the remaining vacancies to the maximum extent possible from system teachers upon a seniority basis that gives no consideration to race; and (c) to then hire to the maximum extent practicable sufficient additional teachers to fill remaining vacancies and assign each of these teachers

to a vacant teaching position. Since at least the late 1960's, these priorities have been required in the teachers' collective bargaining agreement. These policies and practices were uniform throughout the system.

All personnel (e. g., teachers, administrators, principals) new to the system, whether just out of school or from another system, go through a three-year probationary period. After three years they are tenured. Since most of the system's black teachers have been hired only during the last few years, most of them are relatively low on the seniority list. This makes it unlikely that most minority teachers can at this juncture transfer to the schools and positions deemed most desirable among teachers. This situation will change in the years to come as the minority teachers achieve greater seniority.

During the period, the basic policies and practices with respect to assignment of teachers newly hired by the system have been as follows: Each is assigned to one of the vacancies they are licensed for which exist after the system's seniority transfer procedure has been completed. Assignments are pursuant to an Administration determination as to what position each teacher is deemed most qualified for and in which his/her educational contribution will be maximized. Among the factors considered are (1) staff profile, balancing goals including ethnicity, education, experience, sex, age, and geographical background; (2) teachers' desires, it being deemed that happy teachers perform best and/or are more likely to stay within the system; (3) teaching experience, and (4) personal background (including racial or ethnic considerations to the extent this relates to teachers' cultural backgrounds).

During most of the period, the scarcity of qualified teachers caused the Administration to generally honor teachers' personal needs and desires concerning initial assignment. During recent years, new teacher preferences with respect to geographical location of school assignments have not been as important as during the era of teacher shortages when the system had to give virtually overriding consideration to such preferences or lose the teacher.

Since around the mid-1960's, the Board policy and Administration practice has been to profile its teachers, principals, and administrators insofar as this is practicable and educationally desirable. One aspect of the profiling policy has been an endeavor to build integrated staffs in the schools with predominantly black student bodies, as well as in those schools in the outer portions of the city that have predominantly white student bodies. During recent years, the Administration has many times attempted to persuade black and white teachers not to transfer out of a given school when this would harm the balanced racial profile at that school.

During this period, it has not been the Board's policy or the Administration's practice to attempt to compel teachers to stay in the Central City Schools. If a teacher cannot cope with problems in a school or feels uncomfortable there and wants to transfer out when an appropriate opening occurs elsewhere, he/she has been permitted to do so. Teacher collective bargaining agreements have generally barred involuntary reassignments absent a sufficient reason therefor established after an arbitration type hearing and decision. When the teachers' collective bargaining agreement was renegotiated in 1973, the Board and Administration took a strong position about regaining some of their teacher assignment rights which had previously been limited by the collective bargaining agreements. During the final stages of negotiation, they concluded that teachers would have struck to prevent insertion of such provisions in the contract, and the agreement eventually approved did not contain any such alterations.

During this period, a disproportionately large percentage of teacher transfers and teachers leaving the system occurred at schools with higher percentages of black students, and transfers were generally to schools with lower percentages

of black students. There have been a great variety of reasons for this pattern, but basically it has occurred in response to (a) the general feeling among teachers that teaching in those schools is more difficult because of (i) generally lower student achievement levels, (ii) lack of motivation among students, (iii) rapid changeover of students in classes resulting in a lack of teaching continuity, (iv) greater disciplinary problems, (v) the difficulty white teachers have in effectively relating to and communicating with black students because of their differences in cultural standards, backgrounds, and experience, and (vi) a higher percentage of assaults upon teachers and of vandalism to staff autos; (b) distances that have to be traveled from the teachers' homes to the school; and (c) ready availability of other teaching positions deemed more desirable, both within and outside the system.

The aforesaid types of problems existing in schools serving lower socio-economic areas were such that all teachers were not ready to or capable of dealing with them. On the other hand, some teachers have taught at schools having predominantly black student bodies for years because they came there initially pursuant to a desire to teach there, felt successful and had rewarding experiences, and enjoyed the students and the faculty. However, many of these teachers also eventually left for various reasons (e. g., opportunity for professional advancement or promotion, greater educational challenge). Another cause of the disproportionate number of teaching vacancies was the large increases in student population in these schools which resulted in large numbers of additional teaching positions becoming available there. In recent years there has been more stability in this regard.

During 1973, the overall teacher transfer pattern was that of white teachers transferring out of the schools with predominantly black student bodies. With respect to black teacher transfers during this same period, some were from schools with predominantly white student bodies to those with predominantly black student bodies. For example, as of September 1973, 8 of the 17 black teacher transfer requests were from schools in the 0–20% student body racial category to schools in the 81–100% category, while the remaining 9 were from schools in the 81–100% category to schools in that same category. Among the reasons given for these transfers are shorter distances to be traveled from home to school, desire to help black students educationally and to upgrade the education in the latter schools, and a feeling that they can more successfully relate to and educate black students.

The evidence does not establish that during this period teachers said they were transferring out of the black schools because of racial prejudice or negative views toward black students. Rather, most teachers said they were transferring because of such nonracial reasons as lack of student motivation, verbal and/or physical abuse, lack of student achievement, or some other factor unrelated to the students (e. g., shorter distance from home to school). Those transfers asked for during 1972–73 did not contain any stated reasons that amounted to racial bigotry (e. g., an objection to a person because of his race as opposed to other nonracial characteristics).

The aforesaid policies and practices (primarily the seniority transfer procedure) resulted in most black teachers teaching in schools with predominantly black student bodies, and most white teachers teaching in schools with predominantly white student bodies. However, during this period most schools having student bodies with high black percentages (80–100%) generally had teacher populations that were about 50% white. At least since the late 1960's, there has been a conscious attempt by the Administration to raise the percentage of black teachers at those schools with predominantly white student bodies and to distribute black teachers and administrators throughout the system's schools insofar as practicable. There has

never been any effort to keep black teachers from teaching in predominantly white schools.

In 1969–70, there were 31 black teachers in elementary schools with student bodies less than 10% nonwhite, and 11 in those schools in the 10–50% nonwhite category. One or more black teachers were in 71 of the system's 127 elementary schools. During this year, there were 17 black teachers in secondary schools with student bodies less than 0–10% nonwhite, and 4 in those schools in the 10–50% nonwhite category. One or more black teachers were in 29 of the system's 33 secondary schools.

By 1970–71, there were 683 black teachers in the system, and 117 of the schools had integrated faculties, with all secondary schools having integrated faculties except for one junior high school. The lack of teacher turnover in some of the smaller elementary schools foreclosed any opportunity to assign black teachers thereto. Hence, there were still 38 elementary schools with all white faculties.

In 1972–73, there were 23 black teachers and 3 black administrators in elementary schools whose student bodies were less than 10% nonwhite, and 1 black teacher and 3 black administrators were in those schools in the 10–50% nonwhite category. One or more black teachers and/or administrators were in 75 of the system's 129 elementary schools (teachers in 73, administrators in 25). During this same year, there were 18 black teachers and 5 black administrators in secondary schools with student bodies less than 10% nonwhite, and 6 black teachers and 4 black administrators in those schools in the 10–50% nonwhite category. All of the system's secondary schools had one or more black teachers, and 21 of the 35 had one or more black administrators.

### 4. Teacher Quality

During this period, teachers in the system had to have at least a bachelors degree and an appropriate Wisconsin state teaching license. By 1971, all teaching positions were staffed with fully qualified, licensed individuals, the thrust of recruiting having changed from attracting numbers to a qualitative selection as a result of an abundance of applications in every field of teaching.

Some Board members believe that (a) the system's teachers have a variety of abilities that differ from classroom to classroom, (b) there are some very competent teachers doing a very good job and some that are mediocre and not doing as well, and (c) overall, teachers are very dedicated, especially those in the schools that have been experiencing very serious problems.

The evidence does not establish the manner in which those teachers of below or above average quality are or ever were distributed throughout the system's schools, or that a disproportionate percentage of the less capable teachers are or ever were teaching in the schools whose student bodies are predominantly nonwhite, or that at the time of assignment there was any knowledge or way to know which teachers would prove to be below or above average quality.

If a teacher in any school, regardless of student body racial percentage, is deemed to be performing unsatisfactorily, the general policy and practice from 1958 to the present has been to get that teacher out of that school by transferring him/her to a different school or by seeking his/her resignation. This procedure is initiated by reviews of all teachers in the system by the principals of their respective schools with the ultimate determination being made by the Administration. Prior to 1971, only tenured teachers had a right to have that determination reviewed by the Board. After 1971, if any teacher objected to the Administration's determination, there has been a procedure of administrative review ending in binding arbitration.

The system has had a comprehensive program of providing supervisory-consultative expertise and assistance for teachers, particularly the newer ones. These supervisory services are heavily concentrated in schools located in the Central City.

There have also been in-service training programs for teachers with respect to the best techniques of working with and motivating under-achieving students with lower socio-economic backgrounds. This program has been utilized in the Central City Schools to develop sound instructional techniques, educational programs and materials, and to help solve · problems for those teachers working with low achieving students from lower socio-economic backgrounds.

Since the mid-1960's, the regular student-teacher ratios in schools located in the Central City have been lower than in the other schools in the system. During 1973, classes were on the average five pupils smaller in those schools eligible for Title I funds. Further, some schools, such as Washington and Fulton, having discipline, racial conflict, and low achievement problems have been provided with additional administrative staff and a disproportionately large quantum of special services including guidance counselors and special teachers (e. g., reading) in an attempt to eradicate these problems.

There are a disproportionately large number of school aides in those schools located in the Central City (e. g., the largest inner city schools have 10–20 full-time aides; some outer city schools have none). There are three types of aides: paraprofessional, technical, and general. They are hired to meet a particular school's needs and perform a variety of supplementary duties (e. g., maintain order, handle attendance matters). There is no formal education or experience requirements, although some of the paraprofessional aides are teachers. They are generally residents of the neighborhood, and their most valuable attributes are knowledge of the neighborhood and an ability to deal effectively with and understand the students. Hence, there is a predominance of black aides in the schools serving predominantly black residential areas. There are about 2,000 aides in the system, most of whom only work part time.

Some Board members believe that while experience is not the sole criteria with respect to a teacher's ability to perform effectively, historically one of the primary problems in the Central City schools has been that a great many of the teachers there were just out of college. In the earlier portion of this period, the Board and Administration had no practical means of avoiding this. This pattern has changed in recent years.

During 1957–58 through 1967–68, the average and median experience (exclusive of experience outside the system) of teachers in elementary and secondary schools whose student bodies were 0–10% nonwhite were generally greater than that of teachers in the schools whose student bodies were 90–100% nonwhite. The average and median experience of teachers in the 90–100% nonwhite schools were generally 10 to 11 years and 6 to 7 years, respectively; the average for 0–10% nonwhite schools was 4 to 5 years greater, and the median for such schools was 2 to 3 years higher. During most of this period, the schools whose student bodies were 10–33% and 33–67% nonwhite had the highest average teacher experience. The evidence does not establish what the situation was in these respects during 1968–69 to the present.

The evidence does not establish that during this period there were any significant differences in the expenditures per pupil for teacher salaries between those schools whose student bodies were predominantly white and those schools whose student bodies were predominantly black, or that there was a direct relationship between such expenditures per pupil and the student racial percentage in the schools.

During 1967–68, the regular teacher salary expenditure per pupil was $261 in the elementary schools whose students were 0–10% nonwhite as compared to $256 per pupil in the elementary schools whose student bodies were 90–100% black. The expenditures per pupil was $387 in the secondary schools whose student bodies were 90–100% black, as compared to $376 in the secondary schools

whose student bodies were 0–10% non-white. The combined elementary and secondary school expenditures per pupil were $309 per pupil in those schools whose student bodies were 0–10% non-white as compared to $285 in the schools whose student bodies were 90–100% black.

The evidence does not establish what the total teacher salary expenditures were, as the salaries of substitute teachers were not included in the aforesaid figures. The schools with predominantly black student bodies consumed proportionately more substitute teacher days than did those with predominantly white student bodies, thereby requiring additional teacher expenditures. The evidence does not establish what the situation was in these respects in any other years during this period.

During the school years 1964–65 through 1967–68, the median salary of regular teachers in those elementary and secondary schools whose student bodies were 0–10% nonwhite was higher than that of teachers in schools whose student bodies were 90–100% nonwhite. There was no direct relationship between these salary medians and student body racial percentages. Such differences resulted in part from differences in the relative seniority of teachers in the system's schools at those times.

### 5. Social Workers

At present, there is 1 black supervisor and 14 black social workers out of 76 social worker positions. In 1963, 5 of 48 social workers were black. The Administration's basic policy and practice with respect to hiring social workers has been to choose the person best qualified to fill the particular needs of a given position. If the position serves the needs of a particular minority group, the Administration will give weight to the fact that an applicant is a member of that minority group in the belief that he or she will have a greater understanding of the needs of the children involved, will experience better acceptance by the children in that group, and may serve as a role model with respect to those children. Though the requirements imposed upon social workers in various schools in the system are not different, the nature of the services to be provided have been more demanding in the Central City schools.

Social workers may request transfers under a system similar to that for teachers. The stated reasons on the applications have included a desire to advance professionally, to find greater professional challenge, to engage in a different or particular type of work, and feelings of ineffectiveness in working with black persons. The evidence does not establish that any of the transfers have been sought because of racial bigotry.

### 6. Principals and Administrators

The basic policy and practice with respect to principals and administrators has been to make assignments pursuant to relative needs, considering such factors as the size of the school and the number and severity of its problems. Those schools located in the Central City have received a substantially greater quantum of administrative type services.

During 1960–61 through 1967–68, relatively more "probationary" principals and administrators were assigned to those elementary and secondary schools whose student bodies were predominantly black than to those whose student bodies were predominantly white. A principal or administrator is classified as "probationary" if he/she has less than three years' experience in such capacity within the system, regardless of the extent of his/her experience in that capacity outside the city system. Overall, a greater proportion of the schools with predominantly black student bodies were provided additional administrative help than those schools whose student bodies were predominantly white. There was no direct relationship between probationary principals and administrators and the schools' student body racial percentage.

The evidence does not establish to what extent this disproportionality was the result of the disproportionately large

number of assistant principal and administrator positions available in those schools whose student bodies were predominantly black, or the transfer patterns of such personnel under the seniority provisions of the system's collective bargaining contract.

## H. The Impact of Socio-Economic Variables on Educational Achievement

Children throughout the city come to school with varient abilities and willingness to learn, and also bring with them their own behavior patterns, personal problems, and home backgrounds.

The precise relationship between a student's socio-economic environment and background and his/her performance in school is both complex and the subject of much dispute. Educators do not yet fully understand this relationship—what specifically causes it and what can be done to change it. Some consider genetics and resultant intellectual inferiority to be an underlying causal factor. Others correlate academic performance with the number of generations a particular family has been in this country. Among the environmental socio-economic factors which have variously been considered to have an important impact upon schools and the academic achievement level of students are: family income level; family educational level; parental values and expectations, e. g., the importance assigned to education and academic achievement, occupational goals of parents etc.; exposure to and engagement in physical and mental activities that develop school facilitating skills such as motor, oral expression, vocabulary, and language; access to reading materials at home and in the neighborhood, particularly during the years prior to school entry; lack of experiences relevant to schoolwork; a child's rate of mobility, i. e., the number of family moves resulting in school transfers; the nature of a child's background in terms of ease of identification with school programs; the degree of parental involvement with the child and his/her school efforts; and the degree of family stability.

Academic capacities of students are not identical or equal, nor is their motivation to achieve the same. Schools cannot mandate identical achievement levels for all students. The current state of scientific knowledge about the origins or causes of observed racial and social class differences in intelligence quotient and achievement test scores is most unsatisfactory. While the IQ test has served as a reliable predicator of success in school for groups of middle class children of whatever race, it does not measure genetic intellectual ability. When black and white students have the same socio-economic background, there is not a great difference in their average test scores.

During this period, students having relatively low academic achievement levels have been disproportionately concentrated in those Central City schools serving areas having substantial lower socio-economic group populations. Schools in the Central City have generally ranked substantially below those in outlying areas that serve higher socio-economic groups.

There has not been any direct relationship between the student body racial composition of a school and the relative average levels of pupil achievement, intelligence quotients, and school readiness test scores. A rough coincidence of such factors, however, was suggested by the evidence.

For example, with respect to the results of the 1973 kindergarten readiness tests, none of the schools ranking in the top one-quarter were over 16.22%B, and most had very small black pupil population percentages.

None of the schools in the second quarter were over 21.73%B, but there was a wide and varied range of student body racial percentages among the schools so ranked.

The third quarter contained 5 schools whose black pupil percentages were over 85%, including Ninth (100%B), Meinecke (98.54%B), and Auer (96.53%B). Nine schools had no black students, and 7 had

black pupil percentages ranging between 11% and 69%.

The fourth quarter contained 21 schools with student populations that were between 70% and 100% black. Four schools had marginal black student populations, while 6 were substantially integrated.

The results of the 1973 intelligence quotient and achievement tests for the 4th and 6th grades at these same elementary schools indicated a comparable series of patterns but with a substantial change in rank among some individual schools.

The results of the 1973 intelligence quotient and achievement tests for 10th graders revealed a slightly different pattern. The top seven rankings were occupied by schools in the 0–10%B category, while schools in the 11–69%B category occupied the next three spots. South, a school in the 0–10% black category, came next, followed by West which was in the 33–67%B category. The next two places were held by schools in the 90–100%B category, while a school in the 67–90% black category ranked last.

During the period, the Administration has attempted to increase academic achievement through different techniques, approaches, and materials. This effort has also involved an emphasis upon the adaptation of educational programs to the particular needs of a specific school. Lack of motivation has been one of the primary causes of levels of achievement well below students' potential abilities. Educators have been constantly searching for methods and techniques that can be used to instill students with the desire to learn and achieve. The Administration efforts have involved the joint efforts of its psychological and curriculum departments as well as others.

The Administration has strongly emphasized the need for a working relationship between the school and the home. Achievement levels are often affected by a child's home environment between birth and age three. The Administration has endeavored to emphasize the impor-

tance of the home environment to mothers, and has tried to instruct them in some of the techniques involved in enabling young children to have the kinds of experiences necessary for subsequent academic achievement.

The system's Head Start Program for pre-kindergarten children serving families with very low incomes is concentrated in the Central City. It provides an educational environment in a school setting and attempts to form the beginning of a working relationship between home and school. The system also has a special kindergarten program.

During the last two decades, overall relative academic achievement levels in the system have consistently declined, although in 1972–73 there was a small rise. This decline has been attributed to the movement of middle and upper socio-economic classes out of the city.

Some Board and Administration members believe that the system's overall academic achievement levels (including those in the lower socio-economic areas) have finally stopped falling and will now rise substantially. The massive influx of black migrant children into the system has stopped, as has the rapid overall growth in student population. New teaching techniques and programs have been more effective. There has been greater teacher stability in the system and between schools.

I. *The Compensatory Educational Program*

Prior to the mid-1960's, the system provided substantially equal educational services to all schools in the system. Subsequent to the mid-1960's, those schools serving black areas of the city received a greater quantum of such services under the system's compensatory educational program.

The system embarked upon its compensatory educational program in an attempt to increase and equalize the educational opportunities available to low achieving pupils. Because educational needs differed, a disproportionately large quantum of this effort was brought to

bear in those Central City schools where the need was the greatest. With the passage of the Elementary and Secondary Education Act of 1965 ("ESEA"), substantial federal funds became available for such programs, and the efforts to meet the needs of underachieving students were expanded and intensified. The compensatory educational program, however, has not been limited to those schools eligible for Federal Title I funds, nor have federal funds always been available for all schools and pupils having special educational needs.

A 1966–67 report by the Administration to the Board outlined efforts aimed at meeting the special needs of pupils in the system's schools, thus indicating the nature and parameters of the compensatory educational program: instruction for non-English speaking pupils, orientation centers for immigrant and transient children, head start kindergarten centers, special remedial teachers and basic schools, social adjustment-rehabilitative programs, guidance and counseling services, psychological services and educational research, social work services and personnel, and orientation programs for new teachers.

A disproportionately large percentage of these compensatory educational programs have been in schools with majority black student bodies. For example in 1966–67 there were 1,164 instances of such programs, of which 515 (44.24%) were at schools in the 50–100%B category.

The Administration's policy has been to provide the type of educational programs that make equality of educational opportunities a reality in the sense that each student is not only given a meaningful opportunity for a quality education but is encouraged to take advantage of the opportunity and to achieve to the maximum extent possible within the limits of individual capabilities. This has meant that the programs in schools serving lower socio-economic areas have been tailored to meet particular student needs in an effort to provide them a meaningful equality of educational opportunity.

This has also meant that the same amount of money is not being spent for each child within the system because equality of opportunity sometimes calls for greater support of some students and some schools because of their unequal educational needs.

The 1967 report, which explored means of increasing equality of educational opportunities in the system, basically worked within the framework of compensatory education as a means of alleviating low achievement levels and did not articulate a racial balance goal in this regard.

### 1. Special Staffing

Since 1963, a special staffing formula has been used for schools in areas of high population density and mobility. In such schools the staffing formula was 29 to 32 pupils per teacher as compared to 33 to 36 pupils per teacher in the remainder of the system. In 1962–63, this special formula was applied to 29 elementary schools, 24 of which were located in the black Central City. The result was an average regular class size of 30.6 pupils for these schools as compared to an average of 33.4 throughout the remainder of the system. During 1972–73, these special staffing formulas led to class size averages at the elementary school level of 28.8 versus an average of 32.6 in the rest of the system. At the junior high level, class sizes averaged 28.4 as opposed to an average of 30.2 in the rest of the system. At the high school level, the special staffing formula led to average classes of 25.1 as opposed to 26.8 in the remainder of the system.

### 2. Curricular Materials

The efforts of the Administration during this period included working with teachers to develop and select the various kinds of educational materials appropriate to effective teaching of all students in the system's schools. The goal was to have materials available that would be appropriate to the variety of achievement levels among pupils in the classrooms. Concentration has been upon developing supplementary materi-

als for teachers working with low achieving students.

Since the early 1960's, the Administration has had a policy and practice of encouraging utilization of educational materials (both basic and supplementary) that do not contain culturally biased information or presentations. This has involved working with publishers to have such materials created as well as development of such materials within the system. Nonetheless, there are presently still problems in this regard to be overcome, though substantial progress has been made.

### 3. Social Services

A part of the system's compensatory educational effort during this period has been its social service program. It is one of several that supplement and complement the educational process in the schools via direct casework type services furnished students, their parents, teachers, and administrators with respect to school related problems such as social behavior, truancy, aggression, and withdrawal. The basic goal of this program has been to help each child make maximum use of educational opportunities available and to help solve problems which interfere with students achieving their respective maximum educational potential.

At present, there are 76 school social workers, 6 supervisors, and 56 school social worker aides. During the period these social work services have been provided to students in the system in accordance with their relative need therefor and have been available to all pupils in the system's schools. A disproportionately large demand for these services has existed among students attending Central City Schools.

### 4. Psychological Services

During the period, the system has also had an extensive psychological service that has gone beyond diagnosis, recommendation, and consultation to therapist type services. This program has included diagnosis of mental retardation conditions as well as other conditions such as

learning disabilities. A disproportionate quantum of these services have been furnished to students attending black schools pursuant to a standard of need.

### J. Special Programs

During this period, the system has provided at least twelve special programs designed to meet the unique educational needs of various students in the system.

The programs aimed at low and problem achievers have emphasized flexible, individualized approaches to education with few pupils per class and parent involvement. Some of these programs are federally funded and limited to schools eligible for Title I assistance.

Programs have been designed to educate handicapped students, including students who are deemed to be mentally retarded or physically disabled and students with learning difficulties. Those services that have been funded by the system have been provided throughout the system according to need, and those which have been federally funded have been provided to students meeting federal criteria. There has been no discrimination against students because of their race, but a disproportionate share of such services have been provided to students attending Central City schools, including those in majority black schools, because of their disproportionate need.

### 1. The Reading Services Program

The Board has provided reading services to all students within the system upon the basis of need. During this period, special reading center classes were conducted wherever the need existed and educationally practicable space was available. Space problems are not so great now as they were in the past due to declining school enrollments.

The system has operated two special language skill centers located in the black Central City and the white Central City. They emphasize instruction in reading and other language art skills. Access thereto is restricted to children residing in the low income areas of the Central City. The goal is to assist stu-

dents whose reading skills are retarded relative to their predicted abilities. The program stresses small classes and attempts to work closely with parents to the end that the students will overcome their reading deficiencies and return to their home schools at a reading level commensurate with their respective abilities.

Plaintiffs have proven that from 1960–61 through 1967–68, the ratio of enrollment in those schools with reading centers to the number of reading center teachers at that school was generally lower in the schools with student bodies 0–10% nonwhite than in those schools where the percentage was 90–100%. Similarly, plaintiffs proved that the ratio of enrollment to the number of reading center teachers was lower in those schools where the nonwhite percentage was 0–33% than in those schools where it was 67–100%. The evidence, however, does not establish how many students at any given school needed reading center services or what the ratio was in any of these schools between the reading center teacher and the students who actually utilized or required such services.

## 2. The Special Class Program

During the period, the parents of educationally retarded children with acute learning difficulties (i. e., intelligence quotient test scores are about 70% of normal) could choose to have their children attend special classes ("Special C").

Centers for educable retarded children are located throughout the city but not in each school. These classes are dispersed throughout the system because it is deemed to be educationally desirable to keep such students in contact with other regular students. Further, a child is not necessarily in the special class all the time but may be assigned to regular classes with respect to certain matters. Resources, space, and convenience to the children served are among the factors considered in locating such centers, and they can shift from year to year. The children are transported to the classes at public expense.

During 1959–60 through 1967–68, there were disproportionately more students in Special C classes located in schools whose regular student body was predominantly black than in schools whose regular student body was predominantly white, and this disproportionality increased during those years. The evidence, however, does not establish where students in Special C classes resided or what their racial mix was. However, in general, such special classes have had a disproportionate number of black students.

The evidence does not establish that any nonwhite students who should have been recommended for such classes were not so recommended or that any nonwhite students who should not have been recommended for such classes were so recommended.

## 3. The Superior Ability Program

The superior ability students program was developed during the late 1950's and constituted the academic portion of an overall scheme of providing programs for gifted children in various areas.

Students have been selected for this program primarily on the basis of group intelligence and achievement test scores, with those ranking above a given percentile automatically selected. Students who have lower overall scores but high scores in one area or another are individually considered and evaluated by a psychologist and classroom teachers. Generally about 5% of the system's students qualify, but actual enrollment has been smaller because some parents decline to enroll their children in the program. At the elementary level, students participate in the program on a full-time basis in grades 5 and 6. At the secondary level, however, the program is structured by subject so that a student may be in a superior ability class with regard to one subject but not others.

The evidence does not establish that any black student satisfying these criteria was ever denied admission to the program, any white student not satisfying these criteria was ever admitted, or that black and white students assigned to su-

perior ability classes were treated differently or had unequal educational opportunities within the program.

In 1967–68, there were 197 students in the four elementary schools with superior ability classes, 11 of whom (6.28%) were black. At the same time, black students comprised 27.7% of all elementary students. There were 1,492 students in the 14 secondary schools attending superior ability classes, 16 of whom (1.07%) were black. At the same time blacks accounted for 18.47% of all students in the system's secondary schools. The evidence does not establish that these statistics were the result of anything other than uniformly applied selection criteria and/or voluntary election by parents or children not to participate in superior ability classes.

The evidence does not establish in detail what the situation has been during 1968–69 to the present, but in general the number of black students who have qualified for and have been chosen to participate in the program has been disproportionately low.

During this period, the basic policy and practice has been to place superior ability classes in schools located near concentrations of pupils in the program. Classes are not located in each of the system's schools because there are not sufficient numbers of such students residing in each district to justify this. Locations have shifted from time to time as the number of students residing within a particular school district and/or the space available in schools has varied. Generally, an elementary school superior ability center draws students from about 6 to 10 elementary school districts. Secondary level programs generally serve about 2 to 3 districts. If the number of students justifies it, in some instances more than one superior ability class may be established at a particular center. It is deemed to be educationally desirable, when practical, to have teachers of superior ability classes work together and to have interchange among the students in superior ability classes. In 1967–68, there were superior ability classes in 18 schools (4 elementary, 7 junior high, 7

senior high), 16 with student bodies 0–10% nonwhite, and 2 with student bodies 10–33% nonwhite. Pupils are transported to superior ability classes at parental expense, except that they can utilize existing system bus transportation if any goes to or by their school provided they do not displace other pupils riding the bus.

### 4. Trade and Technical Program

Milwaukee Trade & Technical High School (formerly known as Boys' Tech and herein referred to as "Tech") is a vocationally oriented high school serving the entire system. The basic curriculum is essentially the same as that of other high schools in the system except that additional mathematics and laboratory science courses are required. During the period, Tech had very few nonwhite students.

In the past few years, intensified school recruitment efforts have resulted in the number of black enrollees increasing substantially. During 1972–73, 13% of Tech's enrollment was black. The intensified effort to recruit minority students for Tech was prompted by Board action.

Among the reasons given to explain low black enrollment at Tech during the period was the public's understanding that education there prepared one for entry into a trade. Until the last four or five years, there were very few blacks employed in the city in a trade capacity. Consequently, black students generally had little encouragement from their parents and other relatives to become tradesmen and, hence, little motivation to attend Tech.

The name of the school changed from Boys' Tech to Milwaukee Trade & Technical High School in September 1972, and girls were admitted thereafter. This has been an important factor in raising minority student enrollment. In 1973–74, 116 girls were enrolled. Of the 102 black students enrolled in that year, about 50 were girls.

### K. Financial Expenditures

During 1972–73, total estimated expenditures for school operations in the

system were about $144.3 million. Of the total expenditures that year, 63% came from city property taxes, 4% from construction bonds, 8% from federal aid, 21% from state aid, and 4% from other sources. Looking to the objects of expenditure, 61% went for instruction, 2% for buildings and equipment, 12% for plant operation and maintenance, and 25% for other expenses.

### 1. Operating Expenditures

The overall operating cost per regular school pupil in 1971–72 was $953.99. During 1972, per pupil expenditures (including operations, equipment, and maintenance) at the various schools were not directly related to student body racial percentages.

The three senior high schools with the highest per pupil expenditures and their black pupil percentage were West (64%B), Riverside (47%B), and Washington (39%B). The lowest was Bay View (0%B). Per pupil expenditures at King (99%B) and North (100%B) were higher than those of any of the schools in the 0–33%B racial category.

The three junior high schools with the highest per pupil expenditures were Fulton (99%B), Peckham (97%B), and Wells (80%B). The two lowest were Webster (6%B) and Parkman (99%B).

The regular elementary schools with the highest per pupil expenditures were Wilson Park (0%B), Cass (35%B), Berger (98%B), Fourth Street (99%B), Garfield (96%B), Hawley (2%B), Lee (99%B), MacArthur (0%B), McKinley (98%B), and Vieau (1%B). Of the 11 highest per pupil expenditure schools, 5 were in the 95–100% nonwhite category, 1 was 35%, and 5 were in the 0–5% category.

Comparable patterns and nonpatterns existed in 1968 and 1969.

### 2. Construction Expenditures

As to all schools and additions constructed up to 1967–68, the aggregate original cost per pupil when measured by the 1967–68 per school pupil population and racial make-up disclosed that those schools then having white pupil majorities had a higher original cost than the schools having black majorities.

The expenditure per building for buildings constructed after 1950 was higher for the majority black than for the majority white schools, and more was spent on the average in modernizing majority black schools than predominantly white schools.

The evidence does not establish what the student body enrollment or racial percentages were at these schools when the initial buildings were constructed.

The average age of majority black schools was much older than the majority white schools, and hence the figures relating to these schools would be greatly affected by the inflation of building costs over the years.

The evidence does not establish that the amount of money spent for building construction during the same relative time period for like building projects were unreasonably different for schools which had majority black student bodies as compared to majority white. For example, among projects contained in the 1973 revised capital improvement program, both the South (1%B), and North (100%B) replacement high schools were estimated to cost $15.4 million. Similarly, the Twenty-first Street elementary replacement school (99%B) was estimated to cost $2,025,000, while two new elementary schools in the Granville area (predominantly nonwhite residential area) were estimated to cost $2,175,000.

The following table sets forth the cost per classroom of modernization and new construction at various schools:

| Modernization | | New Construction | |
|---|---|---|---|
| School | Cost | School | Cost |
| Elm (82%B) | $29,887 | Alcott (0%B) | $31,983 |
| Hayes (0%B) | 22,202 | MacDowell (76%B) | 28,277 |
| Lloyd (100%B) | 21,790 | Holmes (88%B) | 26,133 |
| Forest Home (3%B) | 19,938 | Hawthorne (6%B) | 24,888 |
| Berger (98%B) | 18,551 | Cooper (0%B) | 21,683 |

There is no direct relationship between a school's student body racial percentages (presently or during the bid year) and the total cost, the cost per square or cubic foot, or the cost per classroom with respect to additions and/or modernizations.

## L. Board Attitudes and Intent

During the period, the Board's fundamental purpose was the maintenance and preservation of the neighborhood school policy. The Board knew that adherence to the neighborhood school policy would result in a high proportion of racially imbalanced schools but believed, in good faith, that such a policy would produce the best possible educational opportunities for all students in the system, regardless of race.

From the mid-1950's through the present, Board members have been generally aware of the areas in the city in which the majority of blacks have resided, as well as the high predominance of black students attending schools serving those areas. They have similarly been aware of the high predominance of white students attending schools serving areas having heavy white residential concentrations. The Board has been concerned about such matters and has often discussed and considered racial changes in the system's schools.

During 1963–64, the Board's Special Committee on Equality of Educational Opportunity conducted an extensive investigation into the problems of the Central City schools. Major proposals considered included formulation of an explicit policy of integrating all schools; inclusion of racial integration as a major criterion in the location of new schools, the drawing of district boundaries and the assignment of teachers; eradication of the intact bussing procedure; and the creation and implementation of a comprehensive plan for integrating all the system's schools. The committee turned down these "integration" proposals, recommending instead that the system concentrate on utilizing massive "compensatory education" in these schools.

The committee concluded that:

(a) "Segregation" in a school system exists only when there is deliberate compulsory separation of white and nonwhite students into separate schools solely on account of their race.

(b) Where a school system has been organized along neighborhood school lines, and where those schools serve all pupils residing in their respective districts without regard to race, color, religion, or national origin, there is no obligation to take affirmative steps to alleviate resulting de facto segregation and/or racial imbalance.

There have not been any affirmative actions taken by the Board that have resulted in further integration or substantial lessening of the percentage of black students in any of the system's schools, nor has the Administration made any such recommendations despite discussions and evaluations by both the Administration and the Board.

The majority of school board members have historically taken the position that the Board is under no obligation to take affirmative steps to effect further integration or racial balance or to lessen the percentage of black pupils in any or all schools within the system. The Board has consistently refused to take any acts that would lessen the degree of racial segregation resulting from residential patterns and the neighborhood school policy as modified by the Free and Open Transfer programs.

Given existing residential racial patterns and the location of the schools having substantial racial imbalance, the Board concluded that the achievement of racial integration would require the abandonment of the neighborhood school policy and what they perceived to be the benefits flowing therefrom. This they were not willing to do.

The following means of attempting to achieve greater racial balance and further integration within the system were deemed to be inconsistent with the neighborhood school policy and accordingly were never used: pairing of schools, bussing of pupils, utilization of magnet schools, modification of open

transfer system, and noncontiguous or pie-shaped districts.

Considerations and reasons that the Board and Administration advanced in support of their failure to take any steps in furtherance of lessening the degree of racial imbalance in the system included the following:

(a) The cost and added expense that any proposed policy of furthering racial integration or racial balance would entail.

(b) Parental opposition to the bussing of their children to schools with large numbers of children from lower socioeconomic backgrounds with the concomitant specter of the movement of massive numbers of middle and upper socio-economic community members out of the city and/or the enrollment of large numbers of children in private schools. Board members are particularly concerned that the overall percentage of black students in the system is presently at the "tipping point" of 30–35%. In their opinion, efforts at obtaining greater racial balance would probably "tip" the entire city and school system within a very few years. On the basis of this predicted tipping, Board members maintain that the short term effect of efforts aimed at achieving racial balance would be outweighed in the long run by the segregative effect of white flight.

(c) The deleterious effects upon students' overall educational and social well being resulting from the loss of benefits considered to flow from a neighborhood school setup, particularly the inability to obtain active and enthusiastic involvement in school activities by parents, pupils, teachers, and administrators.

(d) The time and emotional burdens imposed upon students bussed to schools outside the districts in which they reside.

(e) The Board's belief that racial integration would not substantially improve educational opportunities, the equality of educational programs, or the academic achievement levels of black and/or low achieving students.

The Board and Administration believe that (a) generally, pupils of low socio-economic backgrounds and environments have relatively low achievement levels; (b) socio-economic considerations are an imperative variable with respect to pupil and school achievement levels, and that there is a causal relationship between those two factors rather than between achievement and race *per se*; and (c) the existence of a good student body racial mix, alone, will not raise the achievement levels of low achieving students.

The Board, however, conceded that the attainment of racial integration would not necessarily educationally harm all students. If the result were a socio-economic cross-section of students with corresponding achievement levels in each school, low achieving students might benefit from their association with pupils from middle and upper socio-economic backgrounds. Academic performance would be enhanced, within the limits of individual capabilities, to the extent that low achieving students adopted the goals, perceptions, and motivations of their high achieving classmates. But the Board believed it to be equally true that this might not occur for a variety of reasons.

If the academic competition proved insurmountable to the low achieving students, educationally harmful attitudes might result such as defeatism, resignation, uncomfortableness, lower self-concepts, and feelings of hostility against the educational environment.

Conversely, the Board was concerned that the educational opportunities of high achieving students might be prejudiced. The presence of large numbers of slow achieving students in schools that previously had high achievement levels would necessitate a complete modification of academic programs so as to be able to meet the different educational needs of these students. Previously high achieving pupils might find their motivations decreased substantially because of the change in curriculum and the shift in the composite academic abilities of their peers.

Among the system's educational problems during the period that the Board and Administration deemed to be of higher priority than racial balance were declining achievement levels in the system and relatively low overall achievement levels in those schools serving the lower socio-economic areas of the city. During this period the Board and Administration determined that the best way of attempting to meet the educational needs and problems of the lower socio-economic students, including the students in most of the schools having high black student body percentages, would be via the system's compensatory educational program.

The Board and Administration believed that efforts to resolve the problem of racial isolation in the system's schools were subordinate to the primary objective of providing quality education to the system's students. In their opinion, quality education was advanced by adherence to the neighborhood school policy. In addition, they concluded that affirmative efforts to racially integrate the system's schools would be in derogation of their self-chosen educational objectives. Given these policy guidelines, the results of the Board's actions with respect to racial imbalance were foreordained.

The actions and positions taken by the Board and the Administration during this period were engaged in with the full knowledge that racial segregation existed in the system's schools and would continue to exist unless certain policies were changed, particularly that of neighborhood schools.

At the same time, even Board members inclined toward affirmative action to attain racial goals agree that the majority Board members' views and decisions to the contrary were not motivated by any desire to discriminate against or otherwise "shortchange" black students. To the contrary, the majority members had as their objective quality education for all. From their point of view, quality education required adherence to the neighborhood school policy even though that policy necessitated the creation of segregated schools.

## M. Racial Imbalance

During the first half of the 1950's, there were relatively few nonwhite students in the system. Only 2 high schools, 1 junior high school, and 10 elementary schools had pupil populations that were at least 10% nonwhite. By 1954–55, the increase in the number of nonwhite pupils was such that 4 elementary schools were almost all nonwhite and 3 other elementary schools were about one-third nonwhite. The junior high school previously referred to had become two-thirds nonwhite, while the 2 high schools had become one-third nonwhite.

From 1955–56 through 1962–63, the same pattern essentially continued. By 1959–60, 1 high school had become over 90% nonwhite, another had become over 50% nonwhite, while 2 others had become at least 10% nonwhite. One junior high school had become over 90% nonwhite, and another had become at least 10% nonwhite. Nine elementary schools were over 90% nonwhite, 2 were over 67% nonwhite, and another 2 were over 50% nonwhite. During this period, the overall number of schools having student bodies between 11% and 70% nonwhite steadily increased.

During 1963–64, the system schools had the following nonwhite percentages:

| | 1963–64 | | | | |
|---|---|---|---|---|---|
| | 0–10% | 10–33% | 33–67% | 67–90% | 90–100% |
| Elementary Schools | 86 | 11 | 2 | 4 | 13 |
| Junior High Schools | 11 | -- | 1 | -- | 2 |
| Senior High Schools | 8 | 3 | -- | 1 | 2 |

In 1972–73, the system schools' black pupil populations had increased as follows:

| | 1972–73 | | | | |
|---|---|---|---|---|---|
| | 0–10% | 10–33% | 33–67% | 67–90% | 90–100% |
| Elementary Schools | 71 | 17 | 5 | 5 | 23 |
| Junior High Schools | 10 | 3 | – | 2 | 4 |
| Senior High Schools | 8 | 1 | 3 | 1 | 2 |

There were also 6 separate special schools in the system which had the following black student percentages: 69%, 27%, 89%, 13%, 38%, and 0%.

The following table arrays various statistics for the 4 high schools, the 6 junior high schools, the 28 elementary schools, and the 3 special schools that are presently 67–100% black.

| School | Yr. became 67% Black | % Black Students | 1973–74 No. of Principals and % Black | 1973–74 No. of Asst. Principals & % Black | 1973–74 No. of full time teachers & % Blk. | 1967–68 % Black Teachers | 1963–64 % Black Teachers |
|---|---|---|---|---|---|---|---|
| HS | | 1973 | . . | | | | |
| King | 1967 | 99.55 | 1 (100%) | 3 (66.67%) | 98 (42.86%) | 13.10 | 4.28 |
| Lincoln | 1962 | 82.23 | 1 (100%) | 3 (33.33%) | 73 (38.36%) | 26.92 | 18.33 |
| North | 1957 | 100.00 | 1 (100%) | 4 (75%) | 85 (42.35%) | 34.57 | 31.67 |
| West | 1973 | 68.57 | 1 (0%) | 2 (50%) | 76 (17.11%) | 6.94 | 7.35 |
| JHS | | | | | | | |
| Fulton | 1960 (sem.II) | 98.62 | 1 (100%) | 3 (33%) | 80 (60%) | 56.41 | 45.45 |
| Parkman | 1968 | 99.29 | 1 (100%) | 3 (33%) | 83 (65.06%) | --- | --- |
| Peckham | 1971 * | 97.92 | 1 (0%) | 2 (50%) | 44 (38.64%) | 5.77 | 0 |
| Robinson (Peckman Annex) | 1972 | 85.92 | 1 (0%) | 2 (50%) | 27 (33.33%) | --- | --- |
| Roosevelt | 1953 | 99.47 | 1 (0%) | 2 (100%) | 51 (62.75%) | 51.85 | 48.93 |
| Wells | 1971 | 84.62 | 1 (100%) | 2 (50%) | 55 (50.91%) | 32.20 | 19.30 |
| ES | | | | | | | |
| Auer | 1967 | 98.42 | 1 (0%) | 3 (66.67%) | 53 (30.19%) | 22.73 | 12.50 |
| Berger | 1964 | 98.04 | 1 (100%) | 2 (0%) | 31 (45.16%) | 42.42 | 19.05 |
| Brown | 1961 | 96.17 | 1 (0%) | 1 (100%) | 29 (37.93%) | 51.43 | 40.00 |
| Clarke | 1971 * | 89.79 | 1 (0%) | 2 (100%) | 45 (22.22%) | 16.67 | 11.11 |
| Elm | 1971 * | 82.27 | 1 (0%) | 1 (0%) | 22 (31.82%) | 17.86 | 7.69 |
| Fifth | 1955 | 97.83 | 1 (0%) | 1 (0%) | 24 (37.50%) | 28.57 | 34.62 |
| Fourth | 1950 | 100.00 | 1 (0%) | 0 (0%) | 9 (33.33%) | 64.29 | 64.71 |
| Franklin | 1966 | 98.85 | 2 (0%) | 4 (0%) | 48 (25%) | 26.92 | 8.33 |
| Garden Homes | 1969 | 96.63 | 1 (0%) | 1 (100%) | 25 (36%) | 14.29 | 0 |
| Garfield | 1950 | 94.71 | 1 (0%) | 1 (100%) | 18 (61.11%) | 51.85 | 47.83 |
| Green Bay | 1966 | 98.34 | 1 (0%) | 1 (100%) | 30 (63.33%) | 23.08 | 6.67 |
| Holmes | 1966 | 87.97 | 1 (0%) | 1 (100%) | 38 (55.26%) | 70.00 | -- |
| Hopkins | 1957 | 98.34 | 1 (0%) | 1 (0%) | 37 (45.95%) | 53.66 | 69.23 |
| Keefe | 1960 | 99.52 | 1 (0%) | 1 (100%) | 42 (30.95%) | 44.44 | 40.54 |
| LaFollette | 1959 | 99.28 | 1 (100%) | 1 (0%) | 31 (41.94%) | 38.89 | 42.42 |
| Lee | 1951 | 98.96 | 1 (0%) | 1 (0%) | 17 (52.94%) | 57.69 | 61.54 |
| Lloyd | 1953 | 99.81 | 1 (100%) | 1 (0%) | 28 (46.43%) | 31.03 | 38.39 |
| MacDowell | 1971 * | 75.82 | 1 (0%) | 1 (0%) | 33.4 (29.94%) | 12.12 | -- |
| McKinley | 1962 | 98.28 | 1 (0%) | 1 (100%) | 35 (40%) | 39.39 | 34.29 |
| Meinecke | 1966 | 100.00 | 1 (0%) | 0 (0%) | 10 (30%) | 54.55 | -- |
| Ninth | 1950 | 100.00 | 1 (100%) | 1 (0%) | 24 (58.33%) | 50.00 | 73.08 |
| Palmer | 1960 | 90.96 | 1 (0%) | 1 (100%) | 24 (58.33%) | 46.34 | 46.34 |
| Phillipp | 1966 | 99.55 | 1 (100%) | 0 (0%) | 18 (27.78%) | 18.75 | 9.09 |
| Siefert | 1957 | 96.80 | 1 (0%) | 1 (0%) | 30 (30%) | 39.39 | 35.90 |
| Twelfth | 1957 | 100.00 | 1 (100%) | 1 (0%) | 18 (50%) | 53.57 | 55.56 |
| Twentieth | 1958 | 98.70 | 1 (0%) | 1 (100%) | 30 (43.33%) | 52.78 | 48.48 |
| Twenty-First | 1962 | 99.32 | 1 (0%) | 1 (100%) | 35.2 (59.66%) | 51.43 | 26.67 |
| Walnut | 1965 | 90.20 | 1 (0%) | 1 (100%) | 11 (36.36%) | 57.14 | 15.38 |
| Field | 1972 | 68.24 | 0 (0%) | 0 (0%) | 17 (41.18%) | 0 | 0 |
| Jefferson | 1968 | 87.97 | 1 (100%) | 0 (0%) | 19 (31.58%) | -- | 14.29 |
| Lady Pitts Center | 1973 | 97.30 | 1 (100%) | 0 (0%) | 7 (42.86%) | -- | -- |

\* No data for the 1970–1971 school year

(Pl. Exs. 1–23, 25–27, 278–79, 563, 579–80, 582–83)

## N. *Causes of Racial Imbalance*

The causes of the gross racial imbalance in the system's schools have been completely different from the causes of such imbalance in the South prior to 1954, where blacks and whites residing together in the same geographical area were forced by law to be educated in completely separate school systems.

The gross imbalance in the city's racial residential patterns, superimposed upon the neighborhood school policy, has produced a number of schools which are predominantly white or predominantly black. During the period, schools with large percentages of black students have been located in and serving areas with high percentages of black residential concentration.

Substantial numbers of blacks and whites have seldom resided in the same neighborhood or attended the same schools for a substantial period of time. Once a substantial percentage (generally about 30%) of blacks reside in a neighborhood and/or attend the neighborhood school, there is generally a great acceleration in the rate of change, and thereafter the neighborhood and/or school is generally destined to have a very high predominance of black residents within a relatively short period of time. This phenomenon is referred to as the "tipping point." The rate of change varies among schools and neighborhoods, but it is seldom reversed, as the whites continue to move out at an ever increasing rate and the percentage of black residents correspondingly rises until only residual whites (e. g., elderly and members of lower socio-economic classes) remain. An example of an exception occurs when a new kind of housing is built in a neighborhood (e. g., high cost housing in downtown areas).

The relationship over a substantial period of time between racially changing residential areas and racially changing schools located therein is complex, obtuse, and causally interrelated. There is generally a lower percentage of blacks in the residential neighborhood than in the school located therein. This has been caused by various factors, including the fact that remaining white residents have tended to be substantially older with fewer children of school age than the black residents who are generally younger with a higher fertility rate; the fact that white children have attended private and parochial schools to a greater degree than blacks; and the fact that the net transfers in and out of the school (before families move their residences) have generally resulted in a net addition of black students and a net subtraction of white students. When this divergence between school and neighborhood occurs, it is generally temporary over a relatively short period of time, occurring before the neighborhoods and/or schools become predominantly black. Thereafter, neighborhood and school percentages will be comparable.

The interaction of the neighborhood school policy and black residential patterns, however, has not been the only cause of serious racial imbalance in the system's schools. The Open Transfer program in particular played a significant part in producing racial imbalances at the secondary school level. The 1972 study of open transfers revealed that the program substantially contributed to the increase in black student concentration in at least six secondary schools (King, Lincoln, Peckham, Fulton, Wells, and West). While the effect of transfers on racial imbalance was often surpassed at a later date by the impact of changing residential patterns, the fact remains that the transfer system facilitated the flight of white students from black schools at a point in time preceding a comparable departure of white residents from black neighborhoods.

Moreover, racial imbalances were exacerbated by the steps the Board took to relieve the overcrowding which occurred in certain neighborhood school districts as white populations were replaced by black populations containing relatively more school-aged children. In particular, racial imbalance was advanced by the Board's practices in siting new schools, building additions for existing

schools, leasing or purchasing unused buildings for school purposes, utilizing substandard classrooms, changing district boundaries, and bussing primarily black students intact to primarily white schools where the bussed students were kept separate from students in the receiving school.

The selection of sites for the Center and Pierce replacement schools indicates how school siting can produce racial imbalance. As a result of its location, Pierce remained a white school for many years, whereas the location of Holmes meant it opened as an 85% black school.

The building of large additions to ghetto schools perpetuated the pattern of racial imbalance in these schools. The additional space so created facilitated the "containment" of black pupil population growth within pre-existing school district lines.

The disproportionate use of substandard classrooms in the black schools resulted in concentrating black students at times when the use of facilities at nearby white schools would have resulted in an appreciable degree of race mixture at these white schools.

The general effect of the boundary changes in black schools in 1967–68 was to increase the degree of racial imbalance in these schools. Of the 63 boundary changes, 29 increased the concentration of black students in ghetto schools. In one case it resulted in a number of black students attending a white school for the first time. Twenty-eight changes had no effect because there were no differences in the racial makeup of the losing school or the gaining school. In five cases the results were inconclusive as they affected schools that differed in their racial makeup, although in all five cases majority black schools were involved.

During the period 1960–61 through 1972, large numbers of black children were bussed on an intact basis to white schools as well as black schools. Using intact bussing resulted in the bussed children remaining in black schools. The use of other means of relieving over-crowding would have reduced the concentration in the black schools.

## III. CONCLUSIONS OF LAW

At issue in this case is whether the undisputed racial isolation and imbalance which exists in the Milwaukee public schools is the product of unlawful and unconstitutional segregation.

We are not presented with a situation wherein racial segregation was ever mandated or otherwise required by statutory or other formal law. See, e. g., *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). In the absence of statutes or other legislative enactments requiring racial separation, racial isolation or imbalance constitutes unlawful and unconstitutional segregation only if it was brought about or maintained by intentional state action.

The law is not blind as to only proscribed school segregation which is the result of legislative enactments bearing on their face the mark of governmental action violative of the Equal Protection Clause of the Fourteenth Amendment. The law equally forbids more subtle means of achieving the proscribed end of governmental segregation on the basis of race. The facially neutral actions of state authorities constitute illegal and unconstitutional *de jure* segregation if they are intended to and have the effect of racial separation.

In determining whether the racial imbalance and isolation that presently exists in the Milwaukee school system is the product of unlawful *de jure* segregation, this Court is guided by the decision of the United States Supreme Court in *Keyes v. School District No. 1, Denver, Colorado*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). I will quote at length from the Court's opinion in that case as it sets forth the law to be followed and applied in cases where school

segregation is the result of facially neutral school policies:

"The respondent School Board invoked at trial its 'neighborhood school policy' as explaining racial and ethnic concentrations within the core city schools, arguing that since the core city area population had long been Negro and Hispano, the concentrations were necessarily the result of residential patterns and not of purposefully segregative policies. We have no occasion to consider in this case whether a 'neighborhood school policy' of itself will justify racial or ethnic concentrations in the absence of a finding that school authorities have committed acts constituting *de jure* segregation. It is enough that we hold that the mere assertion of such a policy is not dispositive where, as in this case, the school authorities have been found to have practiced *de jure* segregation in a meaningful portion of the school system by techniques that indicate that the 'neighborhood school' concept has not been maintained free of manipulation. * * *" 413 U.S. at 211–212, 93 S.Ct. at 2699.

" * * * we hold that a finding of intentionally segregative school board actions in a meaningful portion of a school system, as in this case, creates a presumption that other segregated schooling within the system is not adventitious. * * * We emphasize that the differentiating factor between *de jure* segregation and socalled *de facto* segregation to which we referred in *Swann* is purpose or intent to segregate. Where school authorities have been found to have practiced purposeful segregation in part of a school system, they may be expected to oppose system-wide desegregation, as did the respondents in this case, on the ground that their purposefully segregative actions were isolated and individual events, thus leaving plaintiffs with the burden of proving otherwise. But at that point where an intentionally segregative policy is practiced in a meaningful or signifi-

cant segment of a school system, as in this case, the school authorities cannot be heard to argue that plaintiffs have proved only 'isolated and individual' unlawfully segregative actions. In that circumstance, it is both fair and reasonable to require that the school authorities bear the burden of showing that their actions as to other segregated schools within the system were not also motivated by segregative intent." 413 U.S. at 208–209, 93 S.Ct. at 2697.

" * * * the Board's burden is to show that its policies and practices with respect to schoolsite location, school size, school renovations and additions, student-attendance zones, student assignment and transfer options, mobile classroom units, transportation of students, assignment of faculty and staff, etc., considered together and premised on the Board's so-called 'neighborhood school' concept, either were not taken in effectuation of a policy to create or maintain segregation in the core city schools, or, if unsuccessful in that effort, were not factors in causing the existing condition of segregation in these schools. * * *." 413 U.S. at 213, 93 S.Ct. at 2700.

" * * * What is or is not a segregated school will necessarily depend on the facts of each particular case. In addition to the racial and ethnic composition of a school's student body, other factors, such as the racial and ethnic composition of faculty and staff and the community and administration attitudes toward the school, must be taken into consideration. * * *" 413 U.S. at 196, 93 S.Ct. at 2691.

"Petitioners apparently concede for the purposes of this case that in the case of a school system like Denver's, where no statutory dual system has ever existed, plaintiffs must prove not only that segregated schooling exists but also that it was brought about or maintained by intentional state action. * * * [T]he District Court found that '[b]etween 1960 and 1969 the Board's policies with respect to those

northeast Denver schools show an undeviating purpose to isolate Negro students' in segregated schools 'while preserving the Anglo character of [other] schools.' 303 F.Supp. at 294. This finding did not relate to an insubstantial or trivial fragment of the school system. On the contrary, respondent School Board was found guilty of following a deliberate segregation policy at schools attended, in 1969, by 37.69% of Denver's total Negro school population, including one-fourth of the Negro elementary pupils, over two-thirds of the Negro junior high pupils, and over two-fifths of the Negro high school pupils. In addition, there was uncontroverted evidence that teachers and staff had for years been assigned on the basis of a minority teacher to a minority school throughout the school system. * * * We have never suggested that plaintiffs in school desegregation cases must bear the burden of proving the elements of *de jure* segregation as to each and every school or each and every student within the school system. Rather, we have held that where plaintiffs prove that a current condition of segregated schooling exists within a school district where a dual system was compelled or authorized by statute at the time of our decision in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*), the State automatically assumes an affirmative duty 'to effectuate a transition to a racially nondiscriminatory school system,' *Brown v. Board of Education,* 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (*Brown II*), see also *Green v. County School Board,* 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1693–1694, 20 L.Ed.2d 716 (1968), that is, to eliminate from the public schools within their school system 'all vestiges of state-imposed segregation.' *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971).

"This is not a case, however, where a statutory dual system has ever existed. Nevertheless, where plaintiffs prove that the school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system, it is only common sense to conclude that there exists a predicate for a finding of the existence of a dual school system. Several considerations support this conclusion. First, it is obvious that a practice of concentrating Negroes in certain schools by structuring attendance zones or designating 'feeder' schools on the basis of race has the reciprocal effect of keeping other nearby schools predominantly white. Similarly, the practice of building a school * * * to a certain size and in a certain location, 'with conscious knowledge that it would be a segregated school,' * * * has a substantial reciprocal effect on the racial composition of other nearby schools. So also, the use of mobile classrooms, the drafting of student transfer policies, the transportation of students, and the assignment of faculty and staff, on racially identifiable bases, have the clear effect of earmarking schools according to their racial composition, and this, in turn, together with the elements of student assignment and school construction, may have a profound reciprocal effect on the racial composition of residential neighborhoods within a metropolitan area, thereby causing further racial concentration within the schools. We recognized this in *Swann* when we said:

" 'They [school authorities] must decide questions of location and capacity in light of population growth, finances, land values, site availability, through an almost endless list of factors to be considered. The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far reaching. People gravitate toward school facilities, just

as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods.

" 'In the past, choices in this respect have been used as a potent weapon for creating or maintaining a state-segregated school system. In addition to the classic pattern of building schools specifically intended for Negro or white students, school authorities have sometimes, since *Brown*, closed schools which appeared likely to become racially mixed through changes in neighborhood residential patterns. This was sometimes accompanied by building new schools in the areas of white suburban expansion farthest from Negro population centers in order to maintain the separation of the races with a minimum departure from the formal principles of "neighborhood zoning." Such a policy does more than simply influence the short-run composition of the student body of a new school. It may well promote segregated residential patterns which, when combined with "neighborhood zoning," further lock the school system into the mold of separation of the races. Upon a proper showing a district court may consider this in fashioning a remedy.' 402 U.S., at 20–21, 91 S.Ct. [1267] at 1278.

"In short, common sense dictates the conclusion that racially inspired school board actions have an impact beyond the particular schools that are the subjects of those actions. This is not to say, of course, that there can never be a case in which the geographical structure of, or the natural boundaries within, a school district may have the effect of dividing the district into separate, identifiable and unrelated units. Such a determination is essentially a question of fact to be resolved by the trial court in the first instance, but such cases must be rare. In the absence of such a determination, proof of state-imposed segregation in a sub-

stantial portion of the district will suffice to support a finding by the trial court of the existence of a dual system. Of course, where that finding is made, as in cases involving statutory dual systems, the school authorities have an affirmative duty 'to effectuate a transition to a racially nondiscriminatory school system.' *Brown II, supra*, 394 U.S. at 301, 75 S.Ct. [753] at 756." 413 U.S. at 198–203, 93 S.Ct. at 2692–2695.

"The District Court * * * began its examination of the core city schools by requiring that petitioners prove all of the essential elements of *de jure* segregation—that is, stated simply, a current condition of segregation resulting from intentional state action directed specifically to the core city schools. The segregated character of the core city schools could not be and is not denied. Petitioners' proof showed that at the time of trial 22 of the schools in the core city area were less than 30% in Anglo enrollment and 11 of the schools were less than 10% Anglo. Petitioners also introduced substantial evidence demonstrating the existence of a disproportionate racial and ethnic composition of faculty and staff at these schools.

"On the question of segregative intent, petitioners presented evidence tending to show that the Board, through its actions over a period of years, intentionally created and maintained the segregated character of the core city schools. Respondents countered this evidence by arguing that the segregation in these schools is the result of a racially neutral 'neighborhood school policy' and that the acts of which petitioners complain are explicable within the bounds of that policy. * * * " 413 U.S. at 205–207, 93 S.Ct. at 2696–2697.

I will also quote from the recent decision of the United States Court of Appeals for the Eighth Circuit in *United States v. School District of Omaha*, 521 F.2d 530 (8th Cir. 1975). The facts in the *Omaha* case are strikingly similar to

the facts here involved, so much so that the defendants placed principal reliance on the district court's decision in their post-trial brief. Upon review, the district court was promptly reversed:

"Although *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), dealt only with a school system in which segregation was mandated by law; it has since been made clear in a series of 'northern and western' cases [7] that no intentionally segregated school system can be tolerated under the Constitution. It is equally clear that the 'intent' which triggers a finding of unconstitutionality is not an intent to harm black students, but simply an intent to bring about or maintain segregated schools. Thus, even if a school board believes that 'separate but equal' is superior for black children, that belief will not save the intentional segregation from a finding of unconstitutionality. 'Benevolence of motives does not excuse segregative acts.' *Oliver v. Michigan State Board of Education,* 508 F.2d 178, 182–183 (6th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). *See also Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Hart v. Community School Bd. of Ed., N. Y. Sch. Dist. # 21,* 512 F.2d 37, 50 (2nd Cir. 1975).

"7. *See, e. g., Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (Detroit); *Keyes v. School District No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) (Denver); *Hart v. Community School Bd. of Ed., N. Y. Sch. Dist. # 21,* 512 F.2d 37 (2nd Cir. 1975) (New York City); *Morgan v. Kerrigan,* 509 F.2d 580 (1st Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975) (Boston); *Oliver v. Michigan State Board of Education,* 508 F.2d 178 (6th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975) (Kalamazoo); *Berry v. School Dist. of City of Benton Harbor, Mich.,* 505 F.2d 238 (6th Cir. 1974); *Brinkman v. Gilligan,* 503 F.2d 684 (6th Cir. 1974) (Dayton); *Johnson v. San Francisco Unified School District,* 500 F.2d 349 (9th Cir. 1974); *Soria v. Oxnard School District Board of Trustees,* 488 F.2d 579 (9th Cir. 1973), *cert. denied,* 416 U.S. 951–952, 94 S.Ct. 1961, 40 L.Ed.2d 301 (1974); *United States v. Board of Sch. Com'rs of Indianapolis, Ind.,* 474 F.2d 81 (7th Cir.), *cert. denied,* 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973); *Kelly v. Guinn,* 456 F.2d 100 (9th Cir. 1972), *cert. denied,* 413 U.S. 919, 93 S.Ct. 3048, 37 L.Ed.2d 1041 (1973) (Las Vegas); *Davis v. School District of City of Pontiac, Inc.,* 443 F.2d 573 (6th Cir.), *cert. denied,* 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); *United States v. School District 151 of Cook County, Ill.,* 432 F.2d 1147 (7th Cir. 1970), *cert. denied,* 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971); *Taylor v. Board of Ed. of City Sch. Dist. of New Rochelle,* 294 F.2d 36 (2nd Cir.), *cert. denied,* 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961); *Clemons v. Board of Education of Hillsboro,* 228 F.2d 853 (6th Cir.), *cert. denied,* 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956); *Husbands v. Pennsylvania,* 395 F.Supp. 1107 (E.D.Pa.1975); *Booker v. Special School Dist. No. 1, Minneapolis, Minn.,* 351 F.Supp. 799 (D.Minn.1972); *Spangler v. Pasadena City Board of Education,* 311 F.Supp. 501 (C.D.Calif.1970).

"Since segregation in the Omaha public schools was obvious at the time of trial, the only question presented to the District Court was whether or not the defendants intended to bring about or maintain that condition. The District Court properly recognized that segregative intent usually must be inferred. It held, however, that the burden of proving such intent rested at all times on the appellants, and concluded that the appellants had failed to meet that burden, despite its findings that various acts and omissions of the defendants had the natural, probable, foreseeable and actual consequence of creating and maintaining segregation.[8]

"8. The District Court found in several instances that the segregative results were not only foreseeable, but that the defendants had conscious knowledge of the likelihood of such results, particularly with respect to faculty assignment, school construction, and the deterioration of Tech High.

"We hold that a presumption of segregative intent arises once it is established that school authorities have engaged in acts or omissions, the natural, probable and foreseeable consequence of which is to bring about or maintain segregation. [Footnote omitted.] When that presumption arises, the burden shifts to the defendants to es-

tablish that 'segregative intent was not among the factors that motivated their actions.' *Keyes v. School District No. 1,* 413 U.S. 189, 210, 93 S.Ct. 2686, 2698, 37 L.Ed.2d 548 (1973).

"Two other Circuits have recognized a presumption based on the natural, probable and foreseeable consequences test. *Hart v. Community School Bd. of Ed., N. Y. Sch. # 21, supra* 512 F.2d at 50–51; *Oliver v. Michigan State Board of Education, supra* 508 F.2d at 182. The Second Circuit reasoned:

" ' * * * [W]e believe that a finding of *de jure* segregation may be based on actions taken, coupled with omissions made, by governmental authorities which have the natural and foreseeable consequence of causing educational segregation. * * *

" 'To say that the foreseeable must be shown to have been actually foreseen would invite a standard almost impossible of proof save by admissions. When we consider the motivation of people constituting a school board, the task would be even harder, for we are dealing with a collective will. It is difficult enough to find the collective mind of a group of legislators. See *Palmer v. Thompson,* 403 U.S. 217, 224–25, 91 S.Ct. 1940, [29 L.Ed.2d 438] (1971); and see *Keyes v. School District No. 1, supra* 413 U.S. [189] at 233–34, 93 S.Ct. 2686 [37 L.Ed.2d 548] (Powell, J., concurring). It is even harder to find the motivation of local citizens, many of whom would be as reluctant to admit that they have racial prejudice as to admit that they have no sense of humor.

. . . . .

" 'Speaking in *de jure* terms does not require us, then, to limit the state activity which effectively spells segregation only to acts which are provably motivated by a desire to discriminate. See *Wright v. Council of City of Emporia, supra*

407 U.S. [451] at 461–62, 92 S.Ct. 2196 [33 L.Ed.2d 51]. Aside from the difficulties of ferreting out a collective motive and conversely the injustice of ascribing collective will to articulate remarks of particular bigots, the nature of the 'state action' takes its quality from its foreseeable effect. The Fourteenth Amendment is not meant to assess blame but to prevent injustice.' * * * ." 521 F.2d 530, 535–536.

Applying these legal principles to the facts of this case, the Court concludes that the school authorities engaged in practices with the intent and for the purpose of creating and maintaining a segregated school system, and that such practices had the effect of causing current conditions of segregation in the Milwaukee public schools. In arriving at this finding, I have considered the cumulative effect and the totality of the actions taken by the school authorities during the period 1950–1974. During this period of time there were many variables that affected the school system. The school system was changed because of annexations, blacks moved in in great numbers, whites moved out in great numbers, expressways were built, and the fertility rate, life styles, and age of the city's residents changed. The school authorities made thousands of decisions, and I am not unaware of the unending dilemmas that they faced during this traumatic period in the history of the Milwaukee schools. I am also aware that almost any school board decision can be subjected to criticism because of some racial effect, especially when viewed with the benefit of hindsight. I do not believe that it is just for a Court, after the fact, to hold school officials responsible for segregation which has occurred because of factors beyond their control. At the same time, however, where segregation has resulted from the purposeful and intentional acts of school officials, the Court is compelled to make a finding to that effect.

The record indicates that the school authorities always had a nondiscrimina-

tory explanation for their acts. To cite but a few examples: (1) most black teachers wound up in black schools because of contractual seniority provisions which enabled white teachers to transfer out; (2) additions to black schools were built not to contain black children in separate schools but to enable them to walk to school in accordance with the objectives of the neighborhood school policy; (3) boundary lines for school districts were changed, almost invariably resulting in black schools getting blacker, because of the increase in the number of black children; (4) the free transfer policy was adopted not to make it possible and easier for white children to leave black schools (which it did), but because the school authorities wanted to comply with a request from the NAACP; and (5) intact bussing was used not to keep black children separate from whites at the receiving school (which it did), but to enable black children to stay together because they were still part of the sending school, the bussing being only a temporary measure to relieve overcrowding until additional classrooms could be built onto the black sending schools.

These and similar explanations on an isolated basis seem reasonable and at times educationally necessary. In and of itself, any one act or practice may not indicate a segregative intent, but when considered together and over an extended period of time, they do. These acts, previously described in detail, constituted a consistent and deliberate policy of racial isolation and segregation for a period of twenty years. It is hard to believe that out of all the decisions made by school authorities under varying conditions over a twenty-year period, mere chance resulted in there being almost no decision that resulted in the furthering of integration.

In determining the question of intent in school segregation cases, many courts have utilized evidentiary presumptions and/or the much discussed test of foreseeability. See *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *United States v. School District of Omaha,* 521 F.2d 530 (8th Cir. 1975). In this case, however, I have not had to rely upon such devices. My finding that school authorities intended to and did maintain a segregated school system is based directly upon the empirical evidence in the record.

The question of intent, purpose, and motivation has not been a serious problem in this case because school authorities were so straightforward, honest, and direct in their testimony at trial. The Superintendent of Education, Dr. Richard P. Gousha, and the Assistant Superintendent of Education, Dr. Dwight Teel, testified in essence that the Board of School Directors of the City of Milwaukee and its administration is, and has been since 1950, unalterably opposed to any form of forced integration and, from an educational point of view, does not believe in any substantial racial integration in the schools at this time. They further testified that neither the Board nor the Administration has ever in any significant way knowingly cooperated with any policy, program, or law, either federal or state, which had as its objective the integration of the races. They indicated that the school authorities in the past twenty years had not committed an act or adopted a practice that ever resulted in the significant integration of the schools. The superintendent stated that if the system was integrated, most of the whites would move out of the city and resegregation would follow. In taking this position, he argued that school officials were not motivated by a desire to discriminate against blacks but by an interest in a quality education for each child and a belief that this could not be accomplished in an integrated system.

School authorities claim that practically all of their decisions dealing with site selection, school construction, additions and renovations, boundary lines, and intact bussing were made in such a manner to retain the concept of a neighborhood school system in the face of a racially changing and growing population. School authorities assert that their adherence to the neighborhood school poli-

cy derives sanction from the decision of the Seventh Circuit Court of Appeals in *Bell v. School City of Gary, Indiana,* 324 F.2d 209 (1963). In that case, the Court observed at page 213 that:

" * * * 'there is no affirmative U. S. Constitutional duty to change innocently arrived at school attendance districts by the mere fact that shifts in population either increase or decrease the percentage of either Negro or white pupils.'

\* \* \* \* \* \*

" * * * 'the law [does not require] that a school system developed on the neighborhood school plan, honestly and conscientiously constructed with no intention or purpose to segregate the races, must be destroyed or abandoned because the resulting effect is to have a racial imbalance in certain schools where the district is populated almost entirely by Negroes or whites. * * * ' "

The defendants in the present proceedings assert that after the *Bell* case was decided, the official acts of school authorities were designed to fall within the holding of that case.

▆▆▆▆▆ The *Bell* case, however, must be read in light of the subsequent decision of the Supreme Court in *Keyes,* supra. As so read, it would appear that a "neighborhood school system" would be beyond serious constitutional attack if, and only if, the schools in the system remained essentially the same with respect to most of the factors mentioned in *Keyes,* such as teachers, facilities, staff, and boundaries. If such factors remained constant, and the change in the racial composition of the pupil populations in each school reflected only the change in the racial makeup of the attendance areas served, we can assume, for purposes of this case, that the school district would incur no liability to remedy the resulting racial imbalance.

But as soon as school officials start to make changes in school site locations, school sizes, school renovations and additions, student attendance zones, assign-ment and transfer options, transportation of students, assignments of faculty and staff, etc., their actions become, in the words of Mr. Justice Powell's concurring opinion in Keyes, "constitutionally suspect." The fact that these decisions are asserted to have been in conformity with a "neighborhood school policy" does not save them from constitutional scrutiny. As Mr. Justice Powell observed in *Keyes* :

" * * * This does not imply that decisions on faculty assignment, attendance zones, ˉschool construction, closing and consolidation, must be made to the detriment of all neutral, nonracial considerations. But these considerations can, with proper school board initiative, generally be met in a manner that will enhance the degree of school desegregation." 413 U.S. 189, 241, 93 S.Ct. 2686, 2714, 37 L.Ed.2d 548, 582.

In Milwaukee, none of these decisions ever resulted in any significant or noticeable degree of desegregation in the school system, and practically all of them resulted in greater segregation.

The defendants have argued that they are under no duty to desegregate when segregation results from factors over which they have no control. I have accepted that to be the law for purposes of this decision. I have concluded, however, that the segregation which exists in the Milwaukee school system is directly attributable to acts of the defendants.

The actions of Milwaukee school officials can be usefully contrasted with those of the school system in Grand Rapids, Michigan. In upholding the trial court's decision in favor of the school authorities in that case, the Court of Appeals placed reliance on certain steps taken to advance desegregation and to prevent further segregation. *Higgins v. Board of Education of the City of Grand Rapids,* 508 F.2d 779, 791 (6th Cir. 1974), states:

"Here, we are convinced that defendant's neighborhood school policy was in reality racially neutral and that the affirmative action taken by school

officials in the late and middle sixties to improve racial balance was not an 'abandonment' of the neighborhood system so as to preclude them from relying upon it as a valid justification for their position."

In contrast, Milwaukee school authorities were in this case not able to point to one thing they had done to prevent segregation or to desegregate the schools.

Segregation was the result of the cumulative effect of the various decisions made by school officials, and segregation that results from the actions of school authorities is illegal and unconstitutional when those actions are intended and made for that purpose. The fact that substantial segregation was considered by school authorities to be educationally necessary and a prerequisite to quality education does not make it legal. The Constitution does not guarantee one a quality education; it guarantees one an equal education, and the law in this country is that a segregated education that is mandated by school authorities is inherently unequal.

The Court concludes that the defendants have knowingly carried out a systematic program of segregation affecting all of the city's students, teachers, and school facilities, and have intentionally brought about and maintained a dual school system. The Court therefore holds that the entire Milwaukee public school system is unconstitutionally segregated.

Accordingly, contemporaneously with this decision the Court will file a partial judgment permanently enjoining the defendants from discriminating on the basis of race in the operation of the Milwaukee public schools and ordering the defendants to forthwith begin the formulation of plans to effectively eliminate racial segregation from the public schools of Milwaukee, including all consequences and vestiges of segregation previously practiced by the defendants.

Finally, I wish to emphasize that the law governing school segregation is both well established and universal. I was astonished at trial to learn from the testimony of the Milwaukee school officials that they honestly believed that twenty years after *Brown v. Board of Education of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), they could knowingly and intentionally operate a segregated school system because they believed it was educationally superior to an integrated system. It should be apparent to all that if school officials and others do not like this law, then they should seek to amend the United States Constitution, which I am not advocating. To pretend that the law does not exist, or that one does not have to obey it, or that courts do not have to enforce it, or to thrash around when it is enforced serves no useful purpose. If the law against intentional school segregation is unworkable, then it should be repealed. Until then it must be obeyed.

## IV. FINAL MATTERS

### A. *Remaining Issues*

In fairness to the parties, I would like to make brief mention of two issues which were pressed upon the Court at trial.

First, the plaintiffs urged the Court to take into account the "acts of the state" in causing segregated housing in Milwaukee which in turn contributed to school segregation. I believe that the evidence offered on this point is insufficient to enable me to make such a finding. It was suggested that the Court take judicial notice of restrictive covenants and similar practices, as well as this Court's decision in *Otey v. Common Council of the City of Milwaukee,* 281 F.Supp. 264 (E.D.Wis.1968), which outlines the history of open housing legislation in Milwaukee. Although I have taken judicial notice of the *Otey* case, I conclude that the evidence in this case is insufficient to warrant the finding that "state action" caused the segregated housing patterns in Milwaukee.

The plaintiffs also claim that segregated schools have a reciprocal effect on housing by increasing the pressures which cause segregated housing. I do not doubt that this is true, but the evi-

dence in this record does not support such a finding.

Second, school authorities constantly alleged throughout this case that certain characteristics of black school children make their separation from other children "reasonably necessary and desirable from an educational point of view." School authorities assert that they never discriminated against black students because of the color of their skin, but that the requirements of "quality" education necessitated the separation of black school children, or as the school authorities prefer to say, "children from the lower socio-economic groups."

The following excerpt from the "Defendants' Proposed Findings of Fact and Conclusions of Law," Vol. I, section 1554, is indicative of the circumstances which school officials believe militate against the educational advisability of efforts at achieving racial integration:

> "At Peckham at this time racial incidents between teachers and pupils were common. There is so much resentment of white authority by black students that attempts to help and work with students yielded mistrust or a refusal to even bother to hear the teacher. There were daily disturbances which forced a teacher to spend most of a class period as a referee instead of a teacher, with a curse being the usual response from a pupil to a teacher when they confront each other in the classroom. A typical teacher's day started with profanity—disruptive profanity—hard core stuff. Police were called to the school several times a month and fights broke out about three times a day. Children and teachers were threatened with metal pipes, knives and clubs. Pupils' faces were scarred when ripped by other students with metal Afro combs. An assistant principal received a broken nose during a fight with a student. At times pupils come to class drunk. * * * One teacher concluded that (a) the root of the problem is not the education programs, it is the kids who cannot operate effectively in any

school; (b) they have no authority to answer to outside of the school so they don't feel they have to answer authority in the school; and (c) Peckham would be a viable unit if you could take out 200 or 300 of those kids."

The fallacy in the school authorities' reasoning is that they assume that educationally undesirable characteristics are common to all black children and that therefore they are permitted to run a segregated school system. This the law prohibits them from doing. I am not passing on the question of whether or not school authorities can separate school children based on certain behavioral or attitudinal characteristics, but in any event that is not what the Milwaukee school authorities did. They did not separate the high achievers from the low achievers, the nondelinquent from the delinquent, the manageable from the unmanageable, the passive from the violent, and the good from the bad. They just simply separated most of the blacks from most of the whites, and that they may not do under our Constitution even if it results, on the average, in a better education for everyone.

B. *Appointment of a Special Master*

Having concluded that the Milwaukee public school system is unlawfully and unconstitutionally segregated, the Court is confronted with the formidable task of formulating a decree to remedy the wrong suffered by the plaintiff classes. In light of the enormity of that effort, the Court deems it appropriate to appoint, upon its own motion, a special master to assist it in this endeavor. 5A Moore's Federal Practice ¶ 53.05[2], at 2947 (2d ed. 1975).

Rule 53(a) of the Federal Rules of Civil Procedure provides that " * * * the court in which any action is pending may appoint a special master therein." Rule 53(b), however, cautions that "[a] reference to a master shall be the exception and not the rule. * * * [A] reference shall be made only upon a showing that some exceptional condition requires it." The Court has concluded that exception-

al circumstances exist in this case sufficient to justify the appointment of a master.

■ The formulation of a remedial decree in a school desegregation case is no mean matter. As is the case with respect to determining the existence of the constitutional wrong, the nature of appropriate and constitutionally adequate corrective measures will turn in large part on a perceptive and incisive assessment of the delicate factual circumstances involved. Although matters of mere convenience may not thwart constitutionally required corrective steps, a court of equity shall not issue a remedial decree that is factually infeasible. Moreover, once adopted, a remedial decree imposes a substantial supervisory burden on the issuing court. In the Court's opinion, the complexity of the factual details which the remedial task will entail warrants the appointment of a special master to conduct hearings and other proceedings with a view toward making a recommendation to the Court with respect to the question of an appropriate remedial decree.

The use of a special master is not unknown in the area of school desegregation. In both the Detroit and Boston school cases, *Bradley v. Milliken,* 402 F.Supp. 1096, 1104 (E.D.Mich.1975), and *Morgan v. Kerrigan,* 338 F.Supp. 581 (D.C.Mass. 1975) (memorandum of decision and remedial orders, pp. 16–17), masters and/or experts were appointed to assist the Court in the task of formulating and evaluating remedial efforts. While in each of those cases the Court did not make the appointment until after plans and proposals had been submitted by one or both of the parties, this Court is of the opinion that justice will be best served by appointing a master at the outset of the task. In that way the master and the parties' counsel will be able to aid each other in developing an approach which will be consistent with the Constitution and responsive to the rights of the plaintiff classes.

By appointing a special master to assist in the development and implementa-tion of a school desegregation plan, the Court does not intend to modify in any way the defendants' obligation to forthwith begin the preparation of a remedial plan. While the special master will aid in that effort, principal responsibility must rest on the defendants who have access to and are most familiar with the sizeable educational resources which the formulation of a remedial plan will require. Nor does the Court intend to foreclose the active assistance of plaintiffs' counsel whose input is equally necessary to the success of the venture.

■ The Court does not intend to advance any guidelines or otherwise suggest that parameters be placed upon the remedial options which the parties and the master may consider. A court of equity is by definition flexible, and its remedial decrees should be individually tailored to the unique needs and circumstances of each case. The Court is confident that the parties and the master will be able to proceed in good faith to meet the constitutional obligation herein articulated without the need for repeated and detailed direction from this court.

■ To that end, the special master will be authorized to exercise a broad range of powers, subject only to the limitations imposed by law and Rule 53(c) of the Federal Rules of Civil Procedure. The powers of the special master shall include, but are not limited to, the authority to collect evidence, to conduct hearings, to seek the advice of experts, to commission studies and reports, to consult with community groups and civic organizations, and to subpoena witnesses and records. The special master should have a broad range of discretion with respect to the manner in which he carries out his assigned task, and he is hereby empowered to take whatever steps or actions he deems necessary to fulfill the responsibility imposed on him by this court. That responsibility, simply stated, is to develop a plan for the desegregation of the Milwaukee public school system, and to submit that plan to the court for its consideration. The special master will begin his efforts immediately

and shall file a progress report with this court by May 1, 1976. Upon the completion and approval of a remedial plan, the special master will be responsible for the supervision of the plan's implementation and the subsequent review and evaluation of the plan's effectiveness.

Having duly considered the qualifications which the holder of this position should possess, the Court has decided to appoint Dr. John A. Gronouski, formerly of Wisconsin and now of Austin, Texas, to serve as the special master in this case. Dr. Gronouski will bring to the position the considerable skills he has acquired and perfected in a lifetime of public service. Dr. Gronouski has at various times served as the chairman of tax study committees for the Wisconsin State Legislature, Tax Commissioner of Wisconsin, Postmaster General of the United States, the United States Ambassador to Poland, and more recently as Dean and Professor at the Lyndon Baines Johnson School for Public Affairs at the University of Texas. In addition to his expertise in the area of public administration, Dr. Gronouski will bring to the position a substantial understanding of the people and of the City of Milwaukee.

■ The Court directs that the costs and expenses of the special master are to be borne by the defendants. The special master will be compensated for his services at the rate of $50.00 per hour, and will be reimbursed for the necessary expenses he may incur in the course of his duties. The special master will submit a voucher to the court on a monthly basis, which voucher will be reviewed by the court and forwarded to the defendants for payment.

In addition, the defendants shall provide the special master with office space and stenographic services in the offices of the Superintendent of Schools for the City of Milwaukee, and shall furnish additional staff and services as the need arises.

## C. *Entry of Partial Judgment and Certification of Appeal*

■ This Court fully recognizes that the action it has taken today in ruling that the Milwaukee public school system is unconstitutionally segregated may well be disputed by those who are parties to this suit. It also recognizes that its remedial efforts may well be for naught if the determination of liability is ultimately reversed on appeal. At the same time, however, this Court cannot in good conscience hold in abeyance the question of formulating an appropriate remedy to correct the constitutional violations visited upon the plaintiff classes. The Court deems it proper to take certain steps to facilitate appellate review of the liability portions of its decision in the event that either or both parties choose to appeal, but the taking of an appeal or appeals shall in no way abate or otherwise affect the obligation of the defendants to forthwith begin formulation of a plan to secure the plaintiffs' constitutional rights, nor shall an appeal affect the powers and responsibilities conferred upon the special master.

In attempting to effectuate its intentions, the Court is faced with three avenues of appellate review, each of uncertain proportions. In such circumstances it is appropriate for the Court to act in the alternative. 9 Moore's Federal Practice ¶ 110.22[5], at 265–267 (2d ed. 1975). In so doing, the Court is seeking to avoid the injustice to the parties which might follow from an error of judgment on its part with respect to the subtleties of appellate jurisdiction.

As previously noted, the Court will file a partial judgment permanently enjoining the defendants from discriminating upon the basis of race in the operation of the Milwaukee public schools. While it is admittedly unclear whether such a judgment is appealable of right as a final judgment under Rule 54(b) of the Federal Rules of Civil Procedure, cf. *Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572 (2d Cir. 1969), the Court will nevertheless hereby expressly determine that there is no just

reason for delaying the entry of such judgment and directs that judgment be so entered.

Even if this action is inappropriate for treatment as a final judgment under Rule 54(b), it may well be appealable of right under the provisions of 28 U.S.C. § 1292(a)(1) as an interlocutory order granting an injunction. *Spangler v. United States,* 415 F.2d 1242 (9th Cir. 1969).

If an appeal of right does not exist under § 1292(a)(1), the Court considers this case to be a fit candidate for certification under 28 U.S.C. § 1292(b). The issues here decided are of public importance, concerning as they do the duties imposed upon school officials by the Constitution. *Springfield School Committee v. Barksdale,* 348 F.2d 261, 262 (1st Cir. 1965); *Board of Managers of Arkansas Training School for Boys v. George,* 377 F.2d 228, 229 (8th Cir. 1967). The Court accordingly states that today's order involves a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.